**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**FILED**

DEC 1 2 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| WORLDSPAN, L.P., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 05 C 5386 |
| | ) |
| ORBITZ, LLC, | ) Judge John F. Grady |
| | ) |
| Defendant. | ) |

Defendant, Orbitz, LLC, respectfully submits this Memorandum in support of its Motion
to Dismiss, filed concurrently herewith.

## I.    INTRODUCTION

Worldspan brings only one federal claim in this action. That claim incorrectly asserts
that Orbitz violated the Computer Fraud and Abuse Act ("CFAA") -- a primarily criminal statute
aimed at computer hackers -- by "abusing and exceeding" Orbitz's long-standing contractual
right to access Worldspan's computer system. (Compl. ¶2 and Count I.) Worldspan's other
counts arise under Illinois contract law or depend on the CFAA count. Because Worldspan fails
to state a claim under the federal hacking law, Worldspan's additional claims also must fail.[1]

In an attempt to secure federal jurisdiction in a business dispute where the parties are not
diverse, Worldspan recasts a run-of-the-mill breach of contract claim as a federal cybercrime

---

[1] Counts II-IV are Illinois contract claims. Count V is for injunctive relief. If the CFAA claim is
dismissed, the Court should decline to extend pendent jurisdiction over the remaining state contract
claims and also dismiss the claim for injunctive relief, which depends on Counts I-IV. *International
Airports Centers, LLC v. PIC IAC, LLC*, No. 03 C 8104, 2005 WL 241463, at * 4 (N.D. Ill. Jan. 31, 2005)
(dismissing pendent state claims where plaintiff failed to state a cause of action under the CFAA); *Civic
Ctr. Motors, Ltd. v. Mason Street Import Cars, LTD*, 387 F. Supp. 2d 378, 382 (S.D.N.Y. 2005)(same).

punishable by five years in prison. *See*, 18 USC §1030 (c)(2)(B). Indeed, a cursory review of the Complaint reveals that Worldspan's contract claim in Count II of the pleading is substantively identical to Worldspan's purported CFAA claim in Count I. The CFAA does not apply to licensing disputes between business partners, and no court has ever held otherwise. The Court should decline Worldspan's invitation to expand a federal criminal statute to redress behavior that Congress never intended for the CFAA to reach.

The CFAA's meaning, history, and purpose refute Worldspan's novel CFAA theory. The CFAA "contemplate[s] a situation where an outsider or someone without authorization, accesses a computer." *In re America Online, Inc.*, 168 F. Supp. 2d 1359, 1370 (S.D. Fla. 2001); *accord Int'l Ass'n Machinists & Aerospace Workers v. Werner-Matsuda*, 390 F. Supp. 2d 479, 499 (D. Md. 2005) (dismissing complaint where the parties had an agreement permitting defendant to access plaintiff's computer). The legislative history further confirms that the CFAA's civil remedy is meant to "redress damage and loss as a result of serious computer abuse, such as transmission of 'viruses' and 'worms.'" *Id.* (citing S. Rep. No. 101-544, at 4-5 (1990)). Actionable "damage or loss" is restricted to the repair and service interruption costs imposed by a trespasser who has destroyed or corrupted the victim's computer and does not extend to the value of intellectual property as alleged by Worldspan here. Without a "damage" and "loss" as defined by the CFAA, Worldspan has no claim. *See*, Statement of Sen. Leahy, 146 Cong. Rec. S10915 (Oct. 24, 2000): the CFAA "ensure[s] that the full costs to a hacking victim are taken into account"; however, relevant costs are limited to CFAA "loss" – *i.e.*, money spent assessing and repairing computer damage or revenue lost because of an interruption of computer service.

*Id.* at S10916, discussing 18 USC §1030(c)(11) ("loss").[2] Primarily a criminal statute, the CFAA must be interpreted narrowly. *Werner-Matsuda*, 390 F. Supp. 2d at 499.

This case is *not* about computer hacking, and Worldspan's claim does not fit within the CFAA's intended application to "outsiders" who maliciously damage the actual computer hardware, software, or data belonging to cybercrime victims. Indeed, Worldspan's own pleading demonstrates that Orbitz always had legitimate access to Worldspan's computers. Moreover, Worldspan does not and cannot assert that Orbitz actually destroyed or corrupted any software, hardware or data. To the contrary, Worldspan's CFAA claim plainly seeks redress for Orbitz's alleged contract breaches and Orbitz's alleged misappropriation of "valuable data" (Compl. ¶1) – *i.e.*, losses not covered by the CFAA.

Given the CFAA's purpose, intent, and essential elements, it is clear that Worldspan cannot state a claim under the act. Specifically, Worldspan cannot meet its obligation to allege and prove: (1) that its systems were "damaged"; (2) that it suffered a cognizable "loss"; and (3) that Orbitz was not "authorized" to "access" Worldspan's computer. While the courts of this Circuit have had little opportunity to examine the limitations of the CFAA's civil remedy, other courts recently have analyzed the statute thoroughly and have consistently rejected claims such as Worldspan's, including at the pleading stage. This Court should do the same. *See, Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 474-75 (S.D.N.Y. 2004); *Secureinfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 608-09 (E.D. Va. 2005); *Resdev, LLC v. Lot Builders Ass'n, Inc.*, No. 6:04-CV-1374ORL31DAB, 2005 WL 1924743, at *5 (M.D. Fla. Aug. 10, 2005); *Civic Ctr. Motors, Ltd. v. Mason St. Imp. Cars, Ltd.*, 387 F. Supp. 2d 378, 381 (S.D.N.Y. 2005) and

---

[2] As Senator Leahy noted, the definition of "loss" under the CFAA is important: the amount of "loss" determines whether the CFAA's jurisdictional minimum ($5,000) has been met, and it is used to calculate prison sentences. *Id.*

*Werner-Matsuda (supra)*. Each court dismissed CFAA claims based on the plaintiffs' failure to allege or prove "loss," "damage," or "unauthorized access" under the statute, and each case involved CFAA theories that mirror Worldspan's.

Worldspan asks this Court to be the first to hold that any breach of a license agreement involving a computer violates the CFAA. Worldspan would have the Court expand federal jurisdiction, set precedent arguably criminalizing ordinary business disputes (since the private civil remedy is based on conduct supporting criminal penalties under the act), and defeat Congress's express intent *not* to "open the floodgates" to unwarranted private litigation through extension of the "limited civil remedy" that Congress provided to supplement law enforcement's pursuit of computer crimes. Statement of Sen. Leahy, 146 Cong. Rec. S10916 (Oct. 24, 2000). Worldspan's CFAA claim cannot stand.

## II. STANDARD FOR DISMISSAL

Under Rule 12(b)(6), a "complaint must contain facts sufficient to state a claim as a matter of law," but the court is "not obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 657-58 (7th Cir. 2002). Where, as here, a CFAA plaintiff has failed to allege loss, damage, or unauthorized access to a computer consistent with the statute's meaning and purpose, dismissal under Rule 12(b)(6) is appropriate. *Civic Ctr. Motors*, 387 F. Supp. 2d at 382; *Werner-Matsuda*, 390 F. Supp. 2d at 499.

## III. ARGUMENT

In Count I of its Complaint, Worldspan purports to state a claim under 18 USC § 1030(a)(5)(A)(iii). (Compl. ¶ 96.) That subsection of the CFAA makes it unlawful for a party to "*intentionally access*[] a protected computer *without authorization*, and as a result of such conduct, cause[] *damage*." 18 U.S.C. §1030(a)(5)(A)(iii) (emphasis added). A CFAA plaintiff

seeking compensation for economic harm must also establish a "loss" of at least $5,000. *See,* 18 USC §1030(g) (private right of action) and §1030(a)(5)(B)(i) (incorporated by §1030(g) and requiring "loss" of $5,000); *Resdev,* 2005 WL 1924743 at *3-4 (analyzing provisions).

For three independent reasons, Worldspan cannot state a claim under the CFAA as a matter of law. *First,* Worldspan's own Complaint and the parties' written agreement belie Worldspan's assertion that Orbitz accessed Worldspan's computer without authorization – a prerequisite to relief under 18 USC 1030(a)(5)(A)(iii). In fact, Orbitz was always authorized to access Worldspan's computer. Further, Orbitz was permitted to view and to use the very data that Worldspan claims Orbitz has misappropriated. The gravamen of Worldspan's Complaint is that Orbitz, in some instances, breached its license and *misused* data from a computer system to which Orbitz indisputably had authorized access. As such, Worldspan cannot state a CFAA claim. *Werner-Matsuda,* 390 F. Supp. 2d at 499.

*Second,* Worldspan's CFAA claim fails because Worldspan has not properly alleged that Orbitz's alleged conduct caused "damage" to Worldspan's computer system, as that term is expressly defined by the CFAA. "Damage" under the CFAA means direct harm to the computer or data itself, and is limited to "impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). CFAA "damage" does not include the traditional damages recoverable for the misappropriation of intellectual property or trade secrets – the only damage Worldspan claims here.[3] Worldspan's computers and data were not damaged under the CFAA, and Worldspan has no claim. *See, Resdev,* 2005 WL 1924743, at *5.

*Third,* Worldspan similarly cannot allege a "loss" of $5,000 as that term is expressly

---

[3] *See* Compl. at ¶¶1, 4, and 77, alleging the value of Worldspan's data and asserting that Orbitz "stole" Worldspan's "valuable seatmap data."

defined by the CFAA. "Loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Consistent with the treatment of "damage," CFAA "losses" are narrowly confined to costs that result directly from "damage to, or the inoperability of, the accessed computer system." *Civic Ctr. Motors,* 387 F. Supp. 2d at 381. Worldspan's bare "loss" allegation tracking the statute cannot save Worldspan's Complaint from dismissal. *Id.* at 382.

## A. Orbitz Was Authorized to Access the System and Obtain Seat Map Data

To establish liability under its CFAA claim, Worldspan must allege and prove that Orbitz accessed Worldspan's computer "without authorization." However, the Agreement between the parties[4], which is incorporated into the Complaint and controls, establishes exactly the opposite – Orbitz was expressly authorized to access Worldspan's computer.

The title of the Agreement – "Amended and Restated Agreement for CRS [Computer Reservation System] Access and Related Services between Orbitz, LLC and Worldspan, L.P." – indicates that Orbitz has legitimate access to Worldspan's computer system. Further, Section 2.1 of the First Amendment to the Agreement provides: "During the Term of this Agreement, Worldspan will provide Orbitz . . . with *access to the Worldspan System* (including, without limitation, Availability Data Services) for the purpose of the operation of the Orbitz Website and in accordance with the provisions of this Agreement." (First Amendment, ¶ 2, restating § 2.1 (emphasis added).)

---

[4] A copy of the Agreement, which was incorporated into Worldspan's Complaint, is attached hereto as Exhibit A for the Court's convenience. The Agreement was redacted to protect certain confidential information.

Because the Agreement clearly gives Orbitz access to Worldspan's computer system, Worldspan suggests that Orbitz was somehow unauthorized to access particular *data* on the system -- *i.e.*, seatmap information. (Compl. ¶ 97.) However, 18 USC § 1030(a)(5)(A)(iii) requires the defendant's unauthorized access to a *computer*, and not particular data on the computer. Because Orbitz was authorized to access the Worldspan computer system generally, Worldspan cannot state a private CFAA claim.

In any event, Orbitz is explicitly authorized under the Agreement to use the disputed seatmap data as well. The "Worldspan System" includes the "electronic distribution of travel information" (Amended Agreement, Schedule A, ¶ 54), such as seatmap data, and the Agreement expressly contemplates the parties' electronic exchange of "Seat Assignment Messages." (Amended Agreement, Schedule C.)

Worldspan's own Complaint recognizes indirectly that Orbitz has the right to use Worldspan's seatmap data. Paragraph 75 of the Complaint states that "[f]rom the outset of Orbitz's seatmap program, Orbitz obtained seatmap data for **all** flights (Direct Connect and non-Direct Connect) from Worldspan." (Compl. ¶ 75, emphasis added.) However, Worldspan goes on to complain only about Orbitz's alleged use of the seatmap data to support **some flights** -- "Direct Connect" flights not booked through Worldspan. (*See* Compl. ¶ 77: "The First Amendment clearly prohibits this use of Worldspan's valuable seatmap data by prohibiting Orbitz from using the Worldspan system in connection with any Direct Connect segments.") Obviously, Orbitz is authorized both to access Worldspan's computer and to use seatmap data.

The fact is, Orbitz always was authorized to see and to use seatmap data for *every airline* and *every flight* on Worldspan's computer system. That is because Orbitz is contractually permitted to book any flight through Worldspan, even if the flight is on an airline with which

7

Orbitz has a "Direct Connect" or "Supplier Link" relationship that alternatively would permit Orbitz to book through the airline directly. [5] A hypothetical example tracking the allegations of Worldspan's Complaint illustrates the fact that Worldspan is attempting to blur the distinction between (1) Orbitz's alleged *misuse* of data that Orbitz was plainly authorized to access (which is irrelevant to the CFAA) and (2) Orbitz's access to Worldspan's computer:

> American Airlines ("American") is an Orbitz Direct Connect customer. (Compl. ¶ 32.) Subject to an important exception, discussed below, Orbitz is contractually restricted from using Worldspan's data to service Direct Connect flights booked directly through American (First Amendment, ¶ 4) (restating § 3.2(c)(vii)). However, Orbitz is free to use Worldspan data to service non-Direct Connect American flights booked through Worldspan. *Id.* Accordingly, Orbitz could book 10 tickets on a particular American flight, executing 5 transactions through Worldspan (non-Direct Connect segments) and 5 transactions through Orbitz's direct link with American (Direct Connect segments). If Orbitz uses Worldspan seatmap data to service all of the tickets (essentially, what Worldspan alleges in ¶75 of the Complaint), Orbitz clearly has not accessed Worldspan's computer "without authorization." Orbitz was fully authorized to access the system and the data. Worldspan objects to the data's alleged *misuse* for Direct Connect segments.

The distinction between "use" and "access" is critical here. A very recent case from the District of Maryland is directly on point and rejected a claim similar to Worldspan's that

---

[5] The Agreement distinguishes between Direct Connect airlines and Direct Connect flight segments. An "Airline Direct Connect Segment" is defined to mean "each nonstop or direct airline flight booked by means of the Orbitz Website with an Airline Direct Connect Customer using that carrier's internal airline reservation system and not using a CRS or global distribution system." (First Amendment, ¶ 12.) An "Airline Direct Connect Customer" is defined to mean "any airline that has a relationship with Orbitz whereby Orbitz makes air bookings using that air carrier's internal airline reservation system rather than using a CRS or global distribution system." (First Amendment, ¶ 13.) Thus, American Airlines would be an Airline Direct Connect Customer of Orbitz. Any flight segments booked using American Airlines' internal reservations system (rather than Plaintiff's CRS) would be an Airline Direct Connect Segment. However, American Airlines flights booked through Worldspan would remain Airline Non-Direct Connect Segments, regardless of American Airlines' general status as an Airline Direct Connect Customer. (First Amendment, ¶ 13.)

confused "access" and "use." In *Werner-Matsuda*, 390 F. Supp. 2d at 483, the defendant signed a Registration Agreement that gave her access to a secure, proprietary website containing the plaintiff's confidential data, including a membership list. *Id.* The plaintiff alleged that the defendant improperly "accessed" plaintiff's system when she used the plaintiff's membership list in a contractually prohibited way. *Id.* at 483-84.

After exhaustively analyzing the CFAA, relevant case law, and the legislative history, the *Werner-Matsuda* court concluded that the plaintiff had not stated a claim under the CFAA and dismissed plaintiff's CFAA counts under Federal Rule of Civil Procedure 12(b)(6). *Id.* at 499. In so doing, the court noted that, like here, it was undisputed that the defendant was authorized to access the plaintiff's system and to view data that the plaintiff claimed the defendant misappropriated. *Id.* at 497-98. The court then stated: "[T]o the extent that [defendant] may have breached the Registration Agreement by *using* the information obtained for purposes contrary to the policies established by the [plaintiff's] Constitution, it does not follow, as a matter of law, that she was not authorized to access the information. . . ." *Id.* at 498. The CFAA does "not prohibit the unauthorized disclosure or use of information, but rather unauthorized access." *Id* at 499. Nor does the CFAA prohibit authorized access for unauthorized or illegitimate purposes. *Id.*; *accord, Secureinfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 608-09 (E.D. Va. 2005)(dismissing CFAA claim where the defendants allegedly misused information within their access and recognizing the CFAA's focus on outside hackers).

In sum, the *Werner-Matsuda* court rejected the plaintiff's broad characterization of the defendant's conduct as "unauthorized access" to plaintiff's computer, because the defendant indisputably had some access to the system and the "gravamen" of plaintiff's complaint centered on the misuse of information. *Werner-Matsuda*, 390 F. Supp. 2d at 499 n.12. Finally, the court

analyzed the CFAA's legislative history, noting the <u>CFAA should not apply where, as here, the defendant's access to computerized data is allegedly proper in some instances and improper in others.</u> *Id.* Proper in some instances, improper in others is the essence of Worldspan's CFAA claim in this case, as reflected by paragraphs 75 through 77 of the Complaint alleging Orbitz's use of seatmap data for *all* flights but complaining only about the use of seatmap data for *Direct Connect* segments.

Worldspan cannot rely on the Agreement's loose use of the term "access" to claim that Orbitz somehow exerted unauthorized access to Worldspan's computer system within the much stricter definition of that term under the CFAA. Although the Agreement alternately states that Orbitz may not "use" or "access" the Worldspan system for Direct Connect flight segments (First Amendment, ¶4 §3.2(c)(iii) ("use or access"), §3.2(c)(vii)("use")), the term "access" in the Agreement clearly does not have the same meaning assigned to "access" under the statute.

Indeed, the Agreement's restriction against Orbitz's "use or access" for Direct Connect segments is not absolute. As Worldspan points out in its own Complaint (¶56), Orbitz may tap Worldspan's system for information related to Direct Connect segments not booked through Worldspan, *as long as Orbitz pays "significant monthly processing fees to Worldspan."* *Id.*, citing ¶6 of the First Amendment, adding §4.7.[6] The "Supplier Link Processing Fee" contemplated by §4.7 and Schedule E of the amended Agreement is entirely inconsistent with Worldspan's allegation that Orbitz is unauthorized to "access" the system for Direct Connect segments. Under Worldspan's logic, the CFAA prohibits (and criminalizes) behavior that was both contemplated by the parties and accounted for under their written contract. If a licensing agreement obligates the licensee to pay a "processing fee," liquidated damages, or some other

---

[6] Orbitz denies that it owes Worldspan any Supplier Link Processing Fees.

penalty for exceeding the usual limits of the license, the licensor can hardly reach outside the parties' agreement and invoke a criminal statute to address the licensee's excess use.

## B.    Worldspan Has No "Damage" Under The CFAA

Worldspan's CFAA claim fails for the independent reason that Worldspan has not alleged "damage" under the statute. The term "damage" is specifically defined by the CFAA to mean "impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).

Here, Worldspan has not alleged that Orbitz impaired the integrity of its system or data in any relevant way. The Oxford English Reference Dictionary defines the term "integrity" to mean "wholeness" or "soundness." OXFORD ENGLISH REFERENCE DICTIONARY 731 (Rev. 2d ed. 2002). As used in the context of the CFAA, "integrity" means "diminution in the completeness or useability of data or information on a computer system." *Resdev*, 2005 WL 1924743, at \*5 n.3.

Worldspan does not allege that Orbitz destroyed or altered the seatmap data. Worldspan does not allege that its seat availability information was lost or rendered unusable. Likewise, Worldspan does not claim that its computer system or software was impaired in any relevant way by Orbitz's use of the seatmap data. Simply put, Orbitz's alleged use of Worldspan's seatmap data did not "damage" Worldspan's data or its computer system under the CFAA. Accordingly, Worldspan's claim under the CFAA fails as a matter of law and should be dismissed. *Resdev*, 2005 WL 1924743, at \*4-5 (parsing the CFAA's statutory language and applying sound canons of construction to conclude that "damage" and "loss" pertain only to costs incurred as a result of a CFAA defendant's impairment of the victim's computer system or data, and not to "ill-gotten revenue from a trade secret").

11

## C. Worldspan Has No "Loss" Under the CFAA

Worldspan's claim under the CFAA also must be dismissed because Worldspan fails to allege a "loss" as required by the statute. 18 U.S.C. § 1030(g) and § 1030(a)(5)(B)(i). The statutory term was undefined until Congress amended the statute in 2001 to define "loss" as:

> Any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service.

18 U.S.C. § 1030(e)(11) (amendment effective Oct. 26, 2001); *see also Resdev*, 2005 WL 1924743, at *5.

Worldspan baldly alleges that Orbitz caused Worldspan loss "far in excess of $5,000 over a one-year period" – a claim that simply tracks the language of 18 U.S.C. § 1030 (A)(5)(B)(i) in the same manner as the allegation found to be fatally deficient in *Civic Center Motors. Civic Ctr. Motors, Ltd.*, 387 F. Supp. 2d at 382; (Compl. ¶ 98.) Like the *Civic Center Motors* plaintiff, Worldspan does not allege how Orbitz caused Worldspan "loss" or what that purported "loss" is. Noticeably absent from Worldspan's Complaint is any allegation of impairment to Worldspan's computer systems or costs associated with addressing the impairment. The weight of persuasive case law establishes that Worldspan does not allege (nor can it allege) "loss" under the CFAA.[7]

---

[7] This action does not involve the theft of trade secrets by a former employee working for a competitor. As such, the present matter is plainly distinguishable from the short line of unpublished Northern District decisions that have sustained CFAA claims against former employees. Moreover, the former employee cases proceed from an analysis conducted by the Western District of Washington before key amendments to the CFAA went into effect. *See, C.H. Robinson Worldwide, Inc. v. Command Transp., LLC*, No. 05 C 3401, 2005 WL 3077998 (N.D. Ill. Nov. 16, 2005); *Charles Schwab & Co. v. Carter*, No. 04 C 7071, 2005 WL 351929 (N.D. Ill. Feb. 11, 2005); and *George S. May Int'l Co. v. Hostetler*, No. 04 C 1606, 2004 WL 1197395 (N.D. Ill. May 28, 2004), each of which relied on *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121 (W.D. Wash. 2000). Unlike *Nexans, Werner-Matsuda, Resdev* and *Secureinfo* (discussed above), where each court distinguished or rejected *Shurgard*,
(continued...)

In *Nexans Wires*, the court granted defendants' motion for summary judgment, holding that "lost revenue due to lost business opportunity does not constitute 'loss' under the statute." *Nexans Wires*, 319 F. Supp. 2d at 477. Only a loss of revenue due to a repair or an interruption of service -- as opposed to the "loss of business due to defendants' eventual use of the" information retrieved from the computer system -- constitutes a relevant CFAA "loss." *Id.*

Examining the CFAA's legislative history, the court explained that "the meaning of 'loss,' both before and after the term was defined by statute, has consistently meant a cost of investigating or remedying damage to a computer, or a cost incurred because the computer's service was interrupted." *Id.* at 475. Costs incurred "'in responding to an offense' or in 'conducting a damage assessment'" must be related to the computer. *Id., quoting* Cong. Rec. S 10913, 106th Cong. (Oct. 24, 2000). Thus, the costs of remedying damage constitute "loss," but even costs incurred investigating a computer hacker's activities do not. *Id.* at 476.

The *Resdev* court similarly analyzed the narrow definition of "loss" in rejecting a theory of lost revenue proffered by the plaintiff. The court explained that after the 2001 amendment, "the CFAA plainly enumerates a narrow grouping of 'loss' distinct from – and thus excluding – the far greater range of losses that could flow from a violation of the CFAA." *Resdev*, 2005 WL

---

(...continued)

the recent Northern District decisions did not meaningfully address the 2001 CFAA amendments. Those amendments introduced a narrow definition of "loss" and restricted civil actions based on economic harm to situations where the plaintiff can prove such a loss. *See*, 18 USC §1030(a)(5)(B)(i); §1030(e)(11); and §1030(g). Nor, apparently, were the judges in the former employee cases presented with the reasoned statutory analysis and legislative history set forth in *Nexans* and the subsequent decisions supporting this Motion. In fact, Judge St. Eve in *C.H. Robinson* explicitly declined to address the *Nexans* analysis because the defendant had failed to raise the argument in its opening brief. *C.H. Robinson Worldwide*, 2005 WL 3077998, at *3. Accordingly, this Court faces a new issue and new persuasive authority regarding the scope of the CFAA's civil cause of action. To the extent the former employee cases stand for the proposition that a relevant "loss" or "damage" under the CFAA can be established by reference to the commercial value of intellectual property that was not destroyed or otherwise impaired, Orbitz respectfully submits that those cases were incorrectly decided in light of the CFAA's 2001 amendment.

1924743, at *4. Loss contemplates "any revenue lost, cost incurred or other consequential damages incurred *because of interruption of service.*" *Id.* (emphasis in opinion) (quoting 18 U.S.C. § 1030(e)(11)). Accordingly, the court rejected plaintiff's theory that defendant's "ill-gotten revenues" from its unauthorized obtainment of plaintiff's database qualified as a loss under the CFAA. *Id.* at *5. Simply put, the alleged misappropriation of a trade secret's exclusivity value is not a CFAA "loss." *Id.* at *4.

Most recently, the court in *Civic Center Motors* agreed that losses under the CFAA "are compensable only when they result from damage to, or the inoperability of, the accessed computer system." *Civic Ctr. Motors, Ltd.,* 387 F. Supp. 2d at 381. Granting defendants' motion to dismiss, the *Civic Center Motors* court noted that the plaintiffs were (like Worldspan) "seeking compensation for lost profits" due to defendants' alleged "wrongful access" to the plaintiffs' database. *Id.* at 380, 382. However, lost profits resulting from an unfair competitive edge and for a "wasted investment" are not the type of losses falling within the CFAA's ambit. *Id.* In reaching its conclusion, the court noted that plaintiff's bare allegation of "loss" tracking the statute was insufficient to save plaintiff's claim. *Id.* at 381 (rejecting allegations of cognizable CFAA losses in plaintiff's opposition brief, including allegations of data corruption, because such losses were not specifically alleged in the complaint). Because Worldspan does not and cannot allege CFAA damage, loss, and unauthorized access, Count I of Worldspan's Complaint must be dismissed with prejudice.

## D.     The Court Should Decline Jurisdiction Over Worldspan's State Law Claims

Once Worldspan's CFAA claim is dismissed, the Court should not retain jurisdiction over Worldspan's residual state law causes of action and its claim for injunctive relief based on the CFAA and contract counts. Supplemental jurisdiction is to be employed sparingly: "a district court should consider and weigh the factors of judicial economy, convenience, fairness

14

and comity when making its decision." *Wright v. Assoc. Ins. Co., Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). "[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on their merits." *Id.; accord, International Airports Centers*, 2005 WL 241463, at * 4; *Civic Ctr. Motors*, 387 F. Supp. 2d at 382 (dismissing pendent state claims where plaintiff failed to state a cause of action under the CFAA).

### III. CONCLUSION

For the foregoing reasons, Orbitz respectfully requests that the Court dismiss Worldspan's Complaint in its entirety, dismissing Worldspan's CFAA claim with prejudice.

Dated: December 12, 2005

Respectfully submitted,

**ORBITZ, LLC**

By: _____ s/ Jeffrey Bushofsky
One of Its Attorneys

Paul E. Chronis
Jeffrey J. Bushofsky
Aron J. Frakes
Mark J. Altschul
MCDERMOTT WILL & EMERY LLP
227 West Monroe Street
Chicago, IL 60606
Tel: (312) 372-2000
Fax: (312) 984-7700
CHI99 4563831-1.059735.0013

# EXHIBIT A

# Part 1

```
<DOCUMENT>
<TYPE>EX-10.3
<SEQUENCE>3
<FILENAME>a2124294zex-10_3.txt
<DESCRIPTION>EX-10.3
<TEXT>
<Page>
```

Exhibit 10.3

AMENDED AND RESTATED AGREEMENT

FOR

CRS ACCESS AND RELATED SERVICES

between

ORBITZ, LLC

and

WORLDSPAN, L.P.

```
<Page>
```

TABLE OF CONTENTS

```
<Table>
<Caption>
```

|  |  | PAGE |
|---|---|---|
| `<S>` |  | `<C>` |
| ARTICLE I | AGREEMENT, TERM, AND DEFINITIONS............................... | 1 |
|  | 1.1 Agreement....................................................... | 1 |
|  | 1.2 Term............................................................ | 1 |
|  | 1.3 Definitions..................................................... | 2 |
| ARTICLE II | WORLDSPAN SERVICES........................................... | 2 |
|  | 2.1 CRS Access...................................................... | 2 |
|  | 2.2. Service Levels................................................. | 2 |
|  | 2.3 Customer Service and Fulfillment Interface...................... | 2 |
|  | 2.4 Relationships with Travel Suppliers............................. | 2 |
|  | 2.5 Enhancements to WORLDSPAN System................................ | 2 |
|  | 2.6 Continuing Integration Services................................. | 3 |
|  | 2.7 Ticket Printers................................................. | 3 |
|  | 2.8 Worldspan Support Services...................................... | 3 |
|  | 2.9 DIR Gap Analysis................................................ | 4 |
| ARTICLE III | ORBITZ RESPONSIBILITIES..................................... | 4 |
|  | 3.1 Orbitz Website.................................................. | 4 |
|  | 3.2 Use of WORLDSPAN System......................................... | 4 |
|  | 3.3 Capacity Planning............................................... | 5 |
|  | 3.4 Third Party Coordination........................................ | 6 |
|  | 3.5 Use of the Internet............................................. | 7 |
| ARTICLE IV | PAYMENTS..................................................... | 7 |

| | | |
|---|---|---|
| 4.1 | Cost Reimbursement.............................................. | 7 |
| 4.2 | Excess Weighted Message Unit Charges............................. | 7 |
| 4.3 | Segment Fees.................................................... | 8 |
| 4.4 | ITA Subscription Fee............................................ | 9 |
| 4.5 | Time of Payment................................................. | 9 |
| 4.6 | Taxes ......................................................... | 10 |
| ARTICLE V | CONTRACT ADMINISTRATION........................................ | 10 |
| 5.1 | Contract Managers.............................................. | 10 |
| 5.2 | Periodic Meetings.............................................. | 10 |
| 5.3 | Management Reports............................................. | 10 |
| ARTICLE VI | SECURITY, CONFIDENTIALITY, AND PROPRIETARY RIGHTS................ | 10 |
| 6.1 | Security ...................................................... | 10 |
| 6.2 | Confidentiality................................................ | 11 |

&lt;/Table&gt;

i

&lt;Page&gt;

&lt;Table&gt;

&lt;S&gt;                                                                            &lt;C

| | | |
|---|---|---|
| 6.3 | Proprietary Rights............................................. | 11 |
| 6.4 | Orbitz Information............................................. | 11 |
| ARTICLE VII | TERMINATION.................................................... | 12 |
| 7.1 | Termination for Cause.......................................... | 12 |
| 7.2 | Termination for Nonpayment..................................... | 12 |
| 7.3 | Termination for Insolvency..................................... | 12 |
| 7.4 | Termination for Material Service Level Failure................. | 12 |
| 7.5 | Termination Upon a Change-in-Control........................... | 12 |
| 7.6 | Termination Assistance......................................... | 13 |
| ARTICLE VIII | ALLOCATION OF RISKS AND RESOLUTION OF DISPUTES.................. | 13 |
| 8.1 | Mutual Indemnities............................................. | 13 |
| 8.2 | Indemnification Procedures..................................... | 14 |
| 8.3 | Disclaimer..................................................... | 14 |
| 8.4 | Limitations on Liability....................................... | 14 |
| 8.5 | Resolution of Disputes......................................... | 15 |
| ARTICLE IX | MISCELLANEOUS.................................................. | 16 |
| 9.1 | Assignment..................................................... | 16 |
| 9.2 | Notices ....................................................... | 16 |
| 9.3 | Force Majeure.................................................. | 17 |
| 9.4 | Further Assurances............................................. | 17 |
| 9.5 | Press Releases................................................. | 18 |
| 9.6 | Non-Solicitation............................................... | 18 |
| 9.7 | Third Party Beneficiaries...................................... | 18 |
| 9.8 | No Waiver; Cumulative Remedies................................. | 18 |
| 9.9 | Construction................................................... | 18 |
| 9.10 | Severability.................................................. | 18 |
| 9.11 | Counterparts.................................................. | 18 |
| 9.12 | Governing Law................................................. | 19 |
| 9.13 | Amendments.................................................... | 19 |

9.14   Entire Agreement........................................................ 19
9.15   Audit Rights........................................................... 19
</Table>

ii

<Page>

SCHEDULES

SCHEDULE A    DEFINITIONS
SCHEDULE B    SERVICE LEVELS
SCHEDULE C    MESSAGE WEIGHTS
SCHEDULE D    CHARTER AIRLINES

iii

<Page>

AMENDED AND RESTATED AGREEMENT
FOR
CRS ACCESS AND RELATED SERVICES

THIS AMENDED AND RESTATED AGREEMENT (this "Agreement"), dated as of November 1,
2001, is between Orbitz, LLC, a Delaware limited liability company, ("Orbitz")
and Worldspan, L.P., a Delaware limited partnership, ("WORLDSPAN").

WHEREAS, Orbitz has been formed by United Air Lines, Inc., American Airlines,
Inc., Delta Air Lines, Inc., Northwest Airlines, Inc., and Continental Airlines,
Inc. to develop, own, and operate a consumer-oriented Internet travel portal
through which consumers can shop for and book air travel, hotel accommodations,
car rentals, cruises, tours, and other travel-related services;

WHEREAS, Orbitz has selected WORLDSPAN to provide, for this Internet portal,
access to and use of the computer reservations systems operated by WORLDSPAN and
certain related services, as provided in this Agreement, and has selected other
companies to provide the booking engine, fulfillment services, customer service
center, and other products and services required by Orbitz for this Internet
portal;

WHEREAS, Orbitz and Worldspan entered into an Agreement for CRS Access and
Related Services dated August 1, 2000 (the "Original Agreement"); and

WHEREAS, Orbitz and Worldspan desire to amend and restate the Original Agreement
under the terms and conditions of this Agreement;

NOW, THEREFORE, Orbitz and WORLDSPAN (each, a "Party") hereby agree as follows:

ARTICLE I
AGREEMENT, TERM, AND DEFINITIONS

1.1   AGREEMENT. During the Term of this Agreement and in accordance with the
      provisions hereof, WORLDSPAN will provide, and Orbitz will obtain, the CRS
      access and related services described in this Agreement.

1.2   TERM. The term of this Agreement will commence on November 1, 2001 (the
      "Effective Date") and will end on (i) October 31, 2011, or (ii) such
      earlier date upon which this Agreement may be terminated in accordance
      with the provisions of this Agreement ("Term").

1

<Page>

1.3    DEFINITIONS. As used in this Agreement, the terms set forth in Schedule A
       will have the respective meanings specified in Schedule A. Other terms
       used in this Agreement are defined in the context in which they are used
       and will have the respective meanings there specified.

ARTICLE II
WORLDSPAN SERVICES

2.1    CRS ACCESS. During the Term of this Agreement, WORLDSPAN will provide
       Orbitz, as well as the Booking Engine Provider, the Customer Service
       Center Provider, the Fulfillment Provider, and any other third parties
       that may be engaged by Orbitz to provide products or services for the
       operation of the Orbitz Website and that require such access in order to
       provide those products or services, with access to the WORLDSPAN System
       for purposes of the operation of the Orbitz Website and in accordance with
       the provisions of this Agreement.

2.2    SERVICE LEVELS. During the Term of this Agreement, WORLDSPAN will operate
       the WORLDSPAN System in accordance with the Service Levels as set forth on
       Schedule B.

2.3    CUSTOMER SERVICE AND FULFILLMENT INTERFACE. During the Term of this
       Agreement and subject to the charges set forth in Section 2.7, WORLDSPAN
       will (i) provide the Fulfillment Provider, at its facilities, with
       sufficient ticket printers to fulfill the travel services booked by means
       of the Orbitz Website through the WORLDSPAN System, and (ii) provide, at
       WORLDSPAN Actual Cost, the communication lines necessary to connect the
       Fulfillment and Customer Service Center Provider(s) with the WORLDSPAN
       data center.

2.4    RELATIONSHIPS WITH TRAVEL SUPPLIERS. WORLDSPAN will be responsible for
       managing the relationships that it has established with travel suppliers
       throughout the world pursuant to which the travel suppliers pay WORLDSPAN
       fees for transactions booked through the WORLDSPAN System. Although Orbitz
       may establish its own, independent relationships with travel suppliers,
       WORLDSPAN will retain exclusive control over the identity of and the terms
       of its agreements with travel suppliers. The Parties agree to comply with
       the reasonable directions of the travel suppliers with respect to control
       of their respective inventories and related matters.

2.5    ENHANCEMENTS TO WORLDSPAN SYSTEM. WORLDSPAN from time to time may enhance
       or modify the WORLDSPAN System and may change the hardware and/or software
       comprising the WORLDSPAN System and migrate processing for or on behalf of
       Orbitz to such new hardware and/or software. In addition, WORLDSPAN from
       time to time shall offer optional functions, services or equipment to
       Orbitz on or before the time WORLDSPAN generally offers such functions,
       services or equipment to any of its other actual or potential customers at
       such fees, terms and conditions as may be mutually

2

<Page>

       agreed upon. Orbitz's use of any such optional function, service or
       equipment will constitute agreement to such agreed upon fees, terms and
       conditions. WORLDSPAN will use reasonable business efforts to ensure that
       the services provided by WORLDSPAN to Orbitz are not materially adversely
       affected by any such enhancements, modifications or changes or by any such
       optional functions, services or equipment.

2.6    CONTINUING INTEGRATION SERVICES. Throughout the Term of the Agreement,
       Worldspan shall use commercially reasonable efforts to resolve technical
       issues regarding the operation of the Worldspan System, including, without
       limitation, technical issues or suspected errors in the Worldspan System
       that cause travel suppliers to experience problems with fare display,
       availability or sales confirmation on the Orbitz Website (each, a
       "Technical Issue"). Each party shall appoint an employee who shall serve
       as the primary point of contact for the other party with respect to
       Technical Issues (each, a "Technical Contact"). Either party may change
       its Technical Contact at any time upon notice to the other party. In
       addition, the parties agree to participate jointly in communications with
       travel suppliers regarding the status of any Technical Issue.

2.7    TICKET PRINTERS. Subject to availability, Orbitz may purchase Worldspan's
       excess and reconditioned TI600 ATB printers at a cost equal to market
       value not to exceed $3,000 per printer plus shipping and handling. New
       printers may be purchased by Orbitz from Worldspan at Worldspan's cost
       plus shipping and handling and subject to availability. If requested by
       Orbitz, Worldspan shall provide maintenance on such printers and charge
       Orbitz Worldspan's cost. Notwithstanding the foregoing, any printers
       provided by Worldspan to Orbitz prior to the Effective Date may continue
       to be used by Orbitz or its Fulfillment Provider during the Term of this
       Agreement at no charge except for any maintenance charges as provided
       herein. Orbitz may use any of the printers acquired from Worldspan to
       connect with other third parties. All other equipment provided by
       Worldspan must be connected to the Worldspan network and may not be used
       with any other third party. With respect to any printers that are not
       connected to the Worldspan network, Worldspan will provide maintenance
       relating to hardware issues and Orbitz shall be responsible for all other
       maintenance issues impacting such equipment.

2.8    WORLDSPAN SUPPORT SERVICES. Worldspan shall provide to Orbitz at no cost a
       technical sales specialist and Contract Manager to facilitate bookings
       made from the Orbitz Website through the Worldspan System. Worldspan
       acknowledges that the foregoing obligations are intended to reflect the
       support services currently provided to similarly situated Worldspan
       customers with materially similar booking volumes, commitment levels and
       contractual obligations ("Similar Customers"), and that at such time as
       Worldspan offers increased or enhanced support services to Similar
       Customers, equivalent support services shall be offered to Orbitz on terms
       and conditions substantially similar as those offered to Similar
       Customers.

2.9    DIR GAP ANALYSIS. Worldspan shall provide Orbitz with a DIR GAP analysis
       based on the functionality requested by Orbitz. Worldspan shall use
       reasonable commercial efforts to deliver such functionality and usage
       requirements according to the priority lists mutually agreed upon by the
       parties.

                                       3
<Page>

                               ARTICLE III
                          ORBITZ RESPONSIBILITIES

3.1    ORBITZ WEBSITE. Orbitz will establish and maintain the Orbitz Website,
       including performing, or causing third parties to perform, the applicable
       tasks that are the responsibility of Orbitz or such third parties.

3.2    USE OF WORLDSPAN SYSTEM. Orbitz has incorporated the Worldspan System into

the Orbitz Website and will use reasonable business efforts to encourage Users to book travel by means of the Orbitz Website so as to generate Net Segments booked through the Worldspan System. Orbitz will use reasonable business efforts to negotiate with Worldspan for the Worldspan System to be the primary CRS for Corporate Users. Orbitz shall use Worldspan as the primary CRS for any Corporate User that does not have a preference for a CRS. Orbitz agrees that from the Effective Date through July 31, 2003, at least [***] percent ([***]%) of the CRS Segments booked on behalf of all Users, including Corporate Users, by means of the Orbitz Website through a CRS will be booked through the Worldspan System. Commencing on August 1, 2003 and continuing throughout the remainder of the Term, Orbitz agrees that at least (i) [***] percent ([***]%) of the CRS Segments booked on behalf of Users other than Corporate Users by means of the Orbitz Website through a CRS will be booked through the Worldspan System and (ii) [***] percent ([***]%) of the CRS Segments booked on behalf of Corporate Users by means of the Orbitz Website through a CRS will be booked through the Worldspan System. Orbitz will use reasonable business efforts to prevent unauthorized or improper use of the Worldspan System and to ensure that its employees, agents and Users access and use the Worldspan System in compliance with all reasonable instructions provided by Worldspan, including the following:

(a) The WORLDSPAN System may not be used to transmit personal messages, make speculative or improper bookings, train anyone other than Orbitz employees, agents, or Users, or publish or disseminate a compilation of air carrier service or other information.

(b) Proper use of the WORLDSPAN System consists of making proper and legitimate reservations, issuing travel related documents, and performing normal accounting and record keeping functions. Improper use of the WORLDSPAN System includes, without limitation, making speculative bookings, reserving space in anticipation of demand, and improper creation or modification of records.

(c) Orbitz's employees, agents, and Users may not enter passive bookings (e.g., GC, HK, MK or BK codes) into the WORLDSPAN System when no corresponding

----------

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

<Page>

space has been reserved with the corresponding travel supplier's internal reservations system. Any passive bookings will be removed from the WORLDSPAN System if the corresponding space is cancelled.

(d) The material and information supplied by WORLDSPAN will not be manipulated in a manner that would lead to inaccurate, misleading, or discriminatory presentation of information to consumers.

(e) Orbitz will promptly report to WORLDSPAN any incidents of suspected unauthorized access to or use of the WORLDSPAN System and will use reasonable commercial efforts to curtail access to or use of the WORLDSPAN System by any User upon WORLDSPAN's reasonable request.

3.3 CAPACITY PLANNING. By the end of each calendar month throughout the Term,

Orbitz will provide to WORLDSPAN, for purposes of WORLDSPAN's capacity and resource planning, a written notice of Orbitz's best estimate of the number of Net Air Segments, Net Car Segments, and Net Hotel Segments that will be booked by means of the Orbitz Website through the WORLDSPAN System, and the number of any other Message types the Parties may mutually agree to be included in WORLDSPAN's capacity and resource planning, during each of the next twelve (12) months. Except as provided in the next sentence, the notices are provided for informational purposes only and shall not be binding upon Orbitz. With respect to each such notice, Orbitz's estimate for each of the first three (3) months covered by the notice will be considered binding and, except as set forth below, may not be modified in any subsequent such notice or otherwise without the consent of both Parties. Commencing at the beginning of the Term of this Agreement, in the event that the number of Net Air Segments, Net Car Segments, or Net Hotel Segments actually booked by means of the Orbitz Website through the WORLDSPAN System during any month is less than [***] of Orbitz's binding estimate thereof, then Orbitz will reimburse WORLDSPAN for any WORLDSPAN Actual Costs that (i) were actually incurred by WORLDSPAN, and (ii) would have been reasonably incurred by WORLDSPAN in acquiring or dedicating the capacity and resources necessary to accommodate [***] of Orbitz's binding estimate for such month, but (iii) would not have been so incurred to accommodate only the number of such Segments that were actually booked during such month. In the event that WORLDSPAN plans to incur an expense or cost of one million dollars ($1,000,000) or more due to Orbitz's estimate and for which Orbitz might become obligated to reimburse WORLDSPAN pursuant to this Section 3.3, then WORLDSPAN shall promptly notify Orbitz of such planned expense or cost and provide Orbitz with a reasonably detailed explanation of the reasons for such cost or expense, and Orbitz shall have fourteen (14) days to resubmit a forecast with modified binding and non-binding estimates. WORLDSPAN's failure to so notify Orbitz will relieve Orbitz of any liability to reimburse WORLDSPAN for such expense or cost. WORLDSPAN shall use commercially reasonable efforts to avoid and/or mitigate any Orbitz-reimbursable costs or expenses.

----------

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

<Page>

3.4 THIRD PARTY COORDINATION. Orbitz will manage its relationships with the Booking Engine Providers, the Customer Service Center Providers, the Fulfillment Providers, and any other applicable third parties involved in the implementation or operation of the Orbitz Website and will be responsible for the timely performance of their respective obligations relating to WORLDSPAN's performance under this Agreement. In connection therewith, Orbitz acknowledges and agrees that:

(a) Orbitz or its Booking Engine Providers will be responsible for providing the booking engine utilized by the Orbitz Website.

(b) Orbitz or its Customer Service Center Providers will be responsible for customer support relating to the Orbitz Website. Except to the extent otherwise mutually agreed, WORLDSPAN will not be responsible for providing any "help desk" or similar support or assistance with respect to any hardware, software, product, or service that is not provided by WORLDSPAN hereunder. Upon WORLDSPAN's reasonable request

from time to time, Orbitz will notify its employees, agents, and Users of the appropriate places to obtain such support and assistance and that WORLDSPAN is not responsible for providing the same.

(c) Orbitz or its Fulfillment Providers will be responsible for fulfillment of all travel services booked by means of the Orbitz Website.

(d) Unless and until WORLDSPAN is requested to provide such services as provided below, Orbitz or its Domestic Fares Providers will be responsible for providing fares and pricing information relating to Domestic Air Travel for the Orbitz Website. Upon Orbitz's request, WORLDSPAN will commence providing Domestic Air Travel fares and pricing information for the Orbitz Website and will use reasonable business efforts to do so on the schedule reasonably requested by Orbitz and in compliance with the Service Levels. However, if WORLDSPAN is given less than ninety (90) days prior notice that it is to begin providing Domestic Air Travel fares and pricing information for the Orbitz Website, then, for the period ending ninety (90) days after WORLDSPAN is given such notice, WORLDSPAN will be excused from and not held accountable for any failure to meet any Service Level to the extent that such failure results from WORLDSPAN's provision of Domestic Air Travel fares and pricing information for the Orbitz Website.

(e) With respect to the booking engine and any other component of, or used by, the Orbitz Website that directly interfaces with the WORLDSPAN System, Orbitz will use reasonable business efforts to ensure that (i) the component uses the highest participation level in the WORLDSPAN System that is available to the component, (ii) the component's interface to the WORLDSPAN System results in a reasonably efficient use of the WORLDSPAN System, as periodically confirmed by WORLDSPAN's audit, (iii) any software included in the component meets commercially reasonable standards for stability, acceptability, documentation, and integrity and has been sufficiently stress tested to ensure that it will meet

6

<Page>

anticipated volume requirements, and (iv) any hardware used by the component meets WORLDSPAN's reasonable requirements for compatibility.

(f) Each Party will cooperate with the other Party, and will cause each third party under such Party's control or direction to cooperate with the other Party, in the performance of the other Party's obligations hereunder by, among other things, making available such information, data, access to premises, management decisions, approvals, and acceptances as may be reasonably requested by the other Party.

3.5 USE OF THE INTERNET. Since the Orbitz Website will primarily utilize the Internet, which is not managed or controlled by either Party, both Parties acknowledge and agree that:

(a) Any views or comments expressed by either Party in electronic communications sent through the WORLDSPAN System over the Internet will not reflect any review, approval, or endorsement of the other

Party.

(b)    Each Party reserves the right upon the written approval of the other
       Party, to access the other Party's configuration/system in order to
       investigate and resolve system errors or service-related problems.

ARTICLE IV
PAYMENTS

4.1   COST REIMBURSEMENT. Orbitz will reimburse WORLDSPAN for the WORLDSPAN
      Actual Costs incurred by WORLDSPAN in connection with the following:

(a)    Any telecommunication lines and related equipment and services
       associated with communication between WORLDSPAN and Orbitz or Orbitz
       systems.

(b)    Any telecommunication lines and related equipment and services
       associated with communication between WORLDSPAN and (i) the
       Fulfillment Providers, (ii) the Customer Service Center Providers,
       (iii) Orbitz's telecommunications center in Oakbrook, Illinois, and
       (iv) unless otherwise mutually agreed, any other entity for which
       such communication is requested by or on behalf of Orbitz.

4.2   EXCESS WEIGHTED MESSAGE UNIT CHARGES. During the Term of this Agreement,
      Orbitz will pay Worldspan for any excess Weighted Message Units in
      accordance with the following:

(a)    For any month in which Worldspan does not provide Domestic Air
       Travel fares and pricing information for the Orbitz Website and
       during which the number of Weighted Message Units for the Messages
       processed by the Worldspan System is

7

<Page>

greater than [***] times the number of Aggregate Segments booked by
means of the Orbitz Website through the Worldspan System during that
month, Orbitz will pay Worldspan an excess Weighted Message Unit
charge equal to (i) $[***], multiplied by (ii) the amount by which
the number of Weighted Message Units for the Messages processed by
the Worldspan System during that month exceeds [***] times the
number of Aggregate Segments booked by means of the Orbitz Website
through the Worldspan System during that month.

(b)    For any month in which Worldspan does provide Domestic Air Travel
       fares and pricing information for the Orbitz Website and during
       which the number of Weighted Message Units for the Messages
       processed by the Worldspan System is greater than [***] times the
       number of Aggregate Segments booked by means of the Orbitz Website
       through the Worldspan System during that month, Orbitz will pay
       Worldspan an excess Weighted Message Unit charge equal to (i)
       $[***], multiplied by (ii) the amount by which the number of
       Weighted Message Units for the Messages processed by the Worldspan
       System during that month exceeds [***] times the number of Aggregate
       Segments booked by means of the Orbitz Website through the Worldspan
       System during that month. For purposes of this Agreement, the
       parties must consent in writing to the provision of Domestic Air
       Travel fares and pricing information to the Orbitz Website by
       Worldspan.

(c) For any month during which the Response Time Monitor is operational, Orbitz will be entitled to request in writing a credit against any excess Weighted Message Unit charge otherwise payable pursuant to either subsection (a) or subsection (b) of this Section 4.2, which credit shall be equal to the lesser of (i) the amount of such charge, or (ii) $185.00.

4.3 SEGMENT FEES. During the Term of the Agreement, Worldspan will pay Orbitz Base Segment Fees in accordance with the following:

(a) As an inducement for Orbitz to book Segments through the Worldspan System and subject to Section 4.3(b), for each calendar month during the period commencing on the Effective Date and continuing through the remainder of the Term of this Agreement, Worldspan will pay Orbitz the Adjusted Segment Fee for each Net Segment for that month. However, since the Adjusted Segment Fees payable for each month are based, in part, upon the total number of Net Segments for the entire Contract Year in which that month falls, the Parties will not be able to confirm the actual Adjusted Segment Fees payable for any month during a Contract Year until after the end of that Contract Year. Therefore, for each month during each Contract Year, Worldspan will pay Orbitz, on an interim basis, Adjusted Segment Fees determined on the basis of an assumption that the Net Segments for that Contract Year will be equal to 12 times the Net Segments for that month. Promptly after the end of each Contract Year, the Parties will confirm

----------
*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

<Page>

the actual Adjusted Segment Fees payable for each month during that Contract Year and each Party will issue any additional payments or credits that may be necessary to reconcile the amounts previously paid for those months with the actual amounts payable for those months.

(b) Retroactive to June 4, 2001 and continuing until July 31, 2003, this Section shall apply to Net Air Segments and Booking Fees of Charter Airlines. In determining the number of Net Air Segments of Charter Airlines, Worldspan will include ninety-five percent (95%) of the Net Air Segments booked by Orbitz users on Charter Airlines. The remaining five percent (5%) of the Net Air Segments booked by Orbitz users on Charter Airlines will not be taken into consideration in determining the Adjusted Segment Fee payable to Orbitz. In addition, Worldspan will pay Orbitz a fee equal to five percent (5%) of the Booking Fees paid by Charter Airlines to Worldspan for Net Air Segments. This Section 4.3(b) shall not apply to the following: (i) any Net Air Segments or Booking Fees from a Charter Airline that implements a direct connection to Orbitz; (ii) any Charter Airline that ceases to be a Charter Airline; (iii) any Charter Airline that Orbitz is not contractually obligated to pay air segment rebates; (iv) any Net Air Segments or Booking Fees from Charter Airlines after September 30, 2003; or (v) as otherwise agreed by Orbitz and Worldspan.

4.4     ITA SUBSCRIPTION FEE. The parties agree to use their diligent best efforts to reach a definitive agreement by December 31, 2001 whereby Orbitz shall pay Worldspan a subscription fee in exchange for access to Worldspan's availability information on air carrier seat inventory.

4.5     TIME OF PAYMENT. Promptly after the end of each calendar month during the Term of this Agreement, WORLDSPAN will submit to Orbitz:

(a)     An invoice for all amounts that are payable to WORLDSPAN by Orbitz hereunder for that month.

(b)     A report of all amounts that are payable to Orbitz by WORLDSPAN hereunder for that month.

All such amounts, whether payable to WORLDSPAN or Orbitz, will be due and payable within thirty (30) days after the date of the invoice therefor or the report thereof, as the case may be. However, the Party owing the larger amount to the other Party may, at its discretion and after giving the other Party at least ten (10) days' notice thereof, set-off the amount owed to it by the other Party against the amount it owes the other Party and pay only the net amount to the other Party. Any amount payable to either Party that is not paid when due, and any amount that is erroneously paid to either Party and is not repaid within thirty (30) days after that Party receives a written request for repayment, will thereafter bear interest until paid or repaid, as the case may be, at a rate of interest equal to the United States prime rate that, as of the date such amount was due, was then most recently published in the "Money Rates" section of THE WALL STREET JOURNAL; provided,

9

<Page>

however, that in no event will such rate of interest exceed the maximum rate allowed by applicable law.

4.6     TAXES. Each Party will be responsible for, and will pay or reimburse the other for, any sales, use, excise, value-added, or similar taxes (but not including taxes on net income or franchise taxes) that are based upon any services, materials or goods provided to that Party hereunder or upon any amounts payable to the other Party hereunder. Each Party will cooperate with the other in minimizing any applicable taxes, including providing to the other any exemption certificates or other information reasonably requested by the other.

ARTICLE V
CONTRACT ADMINISTRATION

5.1     CONTRACT MANAGERS. Each Party will from time to time appoint, and give the other written notice of the appointment of, an individual (the "Contract Manager" for that Party) who will oversee and manage the performance of that Party's obligations under this Agreement, will serve as that Party's primary point of contact with the other Party, and will be authorized to act for and on behalf of that Party with respect to all matters relating to this Agreement.

5.2     PERIODIC MEETINGS. In order to facilitate and enhance on-going communications, the Contract Managers will meet on a mutually agreed periodic basis, and at such other times as may be reasonably requested by either of them, to review the Parties' performance of their obligations under this Agreement and to discuss technical plans, financial matters,

system performance, service levels and any other matters related to this Agreement that may be reasonably requested by either Party.

5.3    MANAGEMENT REPORTS. On at least a calendar monthly basis, WORLDSPAN will provide to Orbitz reports of WORLDSPAN's performance of its obligations pursuant to this Agreement, including information regarding WORLDSPAN's performance with respect to the Service Levels and such other information upon which the Parties may mutually agree from time to time.

ARTICLE VI
SECURITY, CONFIDENTIALITY, AND PROPRIETARY RIGHTS

6.1    SECURITY. Each Party will implement and maintain appropriate security measures for its operations in accordance with technological developments and its evolving security needs. Those appropriate security measures for each Party will include, without limitation, establishing a security policy for its computer network, preventing unauthorized access to its computer systems, implementing administrative security controls for its computing operations, installing firewalls in its communications network,

10

<Page>

protecting its computer resources from insider abuse, having appropriate administrative procedures to ensure that system access capability to its computer systems is given to only authorized users and is promptly withdrawn from terminated employees or other persons who are no longer authorized, establishing a single point of control for responses to incidents involving its security, and monitoring the effectiveness of the security of its computer network. Neither Party will, or will assist others in efforts to, subvert, compromise, or otherwise interfere with the operations or security of any communications network or computing facility of the other. Each Party will cooperate with the other in investigating and prosecuting any security breaches that affect or threaten the security of the other.

6.2    CONFIDENTIALITY. Each Party agrees that all Confidential Information disclosed to it by the other, whether before or after the Effective Date, will be held in strict confidence, will be used only for purposes of this Agreement, will be kept in as secure a location and with as stringent precautions as the receiving Party uses for its own similar information, will be provided only to those employees and agents of the receiving Party who require such access for purposes of this Agreement, and will not be disclosed to any unauthorized person by the receiving Party or any of its employees or agents except with the prior written consent of the disclosing Party or as may be required by legal or regulatory requirements beyond the control of the receiving Party.

6.3    PROPRIETARY RIGHTS. Orbitz acknowledges and agrees that, as between the Parties, the WORLDSPAN System will be and remain the property of WORLDSPAN and that the WORLDSPAN System constitutes and includes trade secrets and proprietary and confidential information of WORLDSPAN. Orbitz will, and will allow its employees, agents, and Users to, access and use the WORLDSPAN System only for the purposes contemplated by this Agreement. In addition, Orbitz will not, and will not allow its employees, agents, or Users to, copy, duplicate, reproduce, de-compile, reverse engineer, re-engineer, modify, or disclose in any form the WORLDSPAN System or any portion thereof. Upon termination of this Agreement for any reason, Orbitz will promptly return to WORLDSPAN any material relating to the WORLDSPAN System that may be in Orbitz's possession or control.

6.4 ORBITZ INFORMATION. WORLDSPAN acknowledges and agrees that, as between the Parties, the Orbitz Information shall be deemed the confidential and proprietary information of Orbitz and shall be considered as work-made-for-hire. To the extent the Orbitz Information is not considered work-made-for-hire, WORLDSPAN hereby assigns upon creation all ownership rights that WORLDSPAN may have or hereafter acquires in the Orbitz Information to Orbitz. WORLDSPAN shall cooperate with Orbitz in securing, enforcing and otherwise protecting Orbitz's interest in the Orbitz Information, including, without limitation, by signing all documents reasonably requested by Orbitz. Upon request by Orbitz, WORLDSPAN shall provide all Orbitz Information in the form, format and manner as may be reasonably requested by Orbitz. However, notwithstanding the foregoing, WORLDSPAN may disclose Orbitz Information if and to the extent required by legal or regulatory requirements and may use aggregate information and statistics reflecting the use of the WORLDSPAN System by means of the Orbitz Website as long as

11

<Page>

such use is in accordance with applicable legal or regulatory requirements and in accordance with WORLDSPAN's ordinary and customary business practices.

ARTICLE VII
TERMINATION

7.1 TERMINATION FOR CAUSE. In the event that either Party materially defaults in the performance of any of its duties or obligations hereunder and does not substantially cure the default within thirty (30) days after being given written notice specifying the default, or, with respect to any default that cannot reasonably be cured within thirty (30) days, if the defaulting Party fails to proceed promptly after being given such notice to commence curing the default and thereafter to proceed with all due diligence to substantially cure the same, then the Party not in default may, by giving written notice of termination to the defaulting Party at any time thereafter and before the default is substantially cured, terminate this Agreement as of a date specified in the notice of termination.

7.2 TERMINATION FOR NONPAYMENT. In the event that either Party defaults in the payment when due of any amount due to the other Party hereunder and does not cure the default within thirty (30) days after being given written notice specifying the default, then the Party not in default may, by giving written notice of termination to the defaulting Party at any time thereafter and before the default is cured, terminate this Agreement as of a date specified in the notice of termination.

7.3 TERMINATION FOR INSOLVENCY. In the event that either Party becomes or is declared insolvent or bankrupt, is the subject of any proceedings relating to its reorganization, liquidation, insolvency or for the appointment of a receiver or similar officer for it, makes an assignment for the benefit of all or substantially all of its creditors, or enters into an agreement for the composition, extension, or readjustment of all or substantially all of its obligations, then the other Party may, by giving written notice of termination to such Party, terminate this Agreement as of a date specified in the notice of termination.

7.4 TERMINATION FOR MATERIAL SERVICE LEVEL FAILURE. In the event that a

Material Service Level Failure occurs, then Orbitz may, by giving written notice of termination to WORLDSPAN within six (6) months thereafter, terminate this Agreement without any liability as of a date specified in the notice of termination.

7.5    TERMINATION UPON A CHANGE-IN-CONTROL. In the event there is a Change-in-Control of Worldspan, then Worldspan, or any successor in interest to Worldspan (the "Successor"), in its sole discretion within one (1) year from the date of the Change-in-Control, either (i) shall provide for the migration of Orbitz's operations to a computer reservation system operated by the Successor but other than the Worldspan System operated by Worldspan immediately prior to the Change-in-Control (the "Successor System"), provided that the functionality available in the Successor System shall be competitive on an overall basis with the functionality in other global distribution systems, and shall pay for all Migration Costs associated with such migration, or (ii) in the event Worldspan or its Successor

12

<Page>

elects not to migrate Orbitz's operations to the Successor System, then the Successor shall use reasonable commercial efforts to offer equivalent functionality, enhancements and modifications to Orbitz through the Worldspan System as are available to other comparable users of the Successor System throughout the Term of this Agreement. Any failure by Worldspan or a Successor to comply with the foregoing obligations shall constitute a material breach of this Agreement and in such event, not more than 60 days following such breach, Orbitz shall have the right to terminate this Agreement pursuant to this Section 7.5 by providing Worldspan with written notice of the termination 3 months prior to the effective date of termination specified in the notice. Such termination is at the sole discretion of Orbitz and is in lieu of any other remedy available at law or in equity.

7.6    TERMINATION ASSISTANCE. Upon the expiration or termination of this Agreement for any reason, WORLDSPAN will provide to Orbitz, during any applicable notice period and for up to three (3) months after the expiration or termination, such termination assistance as may be reasonably requested by Orbitz to facilitate the orderly transition of responsibility for the services provided by WORLDSPAN hereunder to Orbitz or its designee. If and to the extent that the termination assistance is provided after the expiration or termination of this Agreement or otherwise requires resources in addition to those resources then being regularly utilized in performing services hereunder, Orbitz will pay WORLDSPAN for the termination assistance at WORLDSPAN's then current rates for the resources used therefor or on such other basis as WORLDSPAN and Orbitz may agree upon at that time. However, if this Agreement is terminated by WORLDSPAN pursuant to Section 7.1, 7.2 or 7.3 hereof, then WORLDSPAN may, as a condition to WORLDSPAN's obligation to provide any termination assistance for Orbitz during any month, require Orbitz to pay to WORLDSPAN, prior to the first day of that month, an amount equal to WORLDSPAN's reasonable estimate of the total amount payable to WORLDSPAN for termination assistance during that month.

ARTICLE VIII
ALLOCATION OF RISKS AND RESOLUTION OF DISPUTES

8.1    MUTUAL INDEMNITIES. Each Party agrees to indemnify, defend, and hold harmless the other Party and its successors, assigns, affiliates,

officers, employees, and agents from and against any and all claims, actions, damages, liabilities, costs and expenses, including reasonable attorneys' fees and expenses, arising out of any third party claim related to:

(a) Any death or personal injury, or any destruction of or damage to any real or tangible personal property, alleged to have been caused by or on behalf of the indemnifying Party or its employees or agents.

(b) Any infringement of a United States letters patent, a trade secret, or any copyright, trademark, service mark, trade name or similar proprietary rights conferred by statute, by common law, or by contract alleged to have occurred as a result of rights conveyed, materials provided, or work performed by or on behalf of the indemnifying Party.

13

<Page>

8.2 INDEMNIFICATION PROCEDURES. Any Party claiming indemnification pursuant to this Agreement will give the indemnifying Party prompt written notice of any matters with respect to which this indemnity may apply, will give the indemnifying Party full opportunity to control the response thereto and the defense thereof, and will provide reasonable cooperation and assistance in connection with the defense and/or settlement of the claim. However, the indemnified Party may, at its own expense, participate in such defense and in any settlement discussions, either directly or through counsel of its choice.

8.3 DISCLAIMER. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES, AND EACH PARTY HEREBY DISCLAIMS, ANY INDEMNITIES, WARRANTIES, INDEMNIFICATIONS, GUARANTEES, OR REPRESENTATIONS OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

8.4 LIMITATIONS ON LIABILITY. ANY LIABILITY OF EITHER PARTY ARISING FROM OR RELATING TO THIS AGREEMENT, WHETHER BASED ON CONTRACT, TORT, NEGLIGENCE, INTENDED CONDUCT, STRICT LIABILITY, OR OTHERWISE, WILL BE LIMITED TO THE OTHER PARTY'S ACTUAL, DIRECT DAMAGES AND WILL BE SUBJECT TO THE FOLLOWING:

(a) EXCEPT FOR DAMAGES RESULTING FROM THE LIABLE PARTY'S GROSS NEGLIGENCE, WILLFUL MISCONDUCT, OR FAILURE TO PERFORM ANY OF ITS CONFIDENTIALITY, INDEMNIFICATION, OR PAYMENT OBLIGATIONS HEREUNDER, THE AMOUNT OF DAMAGES RECOVERABLE AGAINST THE LIABLE PARTY FOR ALL EVENTS, ACTS, AND OMISSIONS WILL NOT EXCEED, IN THE AGGREGATE, THE SUM OF TWENTY MILLION DOLLARS ($20,000,000).

(b) IN NO EVENT WILL THE LIABLE PARTY BE LIABLE FOR (I) ANY INDIRECT, CONSEQUENTIAL, INCIDENTAL, SPECIAL, OR PUNITIVE DAMAGES, EXCEPTING DAMAGES ARISING OUT OF THE LIABLE PARTY'S INDEMNIFICATION OBLIGATIONS SET FORTH IN THIS ARTICLE VIII, OR (II) ANY DAMAGES THAT COULD HAVE BEEN PREVENTED OR MITIGATED BY THE OTHER PARTY'S TAKING REASONABLE PRECAUTIONS OR FOLLOWING REASONABLE PROCEDURES.

8.5 RESOLUTION OF DISPUTES. In the event of any dispute between the Parties arising from or relating to this Agreement, the Parties will resolve the dispute by using the following procedures:

(a) Upon the request of either Party, the Contract Managers will meet to discuss the dispute, will exchange any information that they

mutually agree is relevant to the

14

&lt;Page&gt;

issues in dispute, and will use all reasonable efforts to resolve
the dispute without the need for further proceedings.

(b)     If the Contract Managers fail to resolve the dispute within ten (10)
business days after the initial request that they meet to resolve
the dispute in accordance with subsection (a) above, or mutually
conclude in good faith that they are unlikely to resolve the
dispute, then, upon the request of either Party, each of the Parties
will designate a senior executive, who may be supported by legal and
technical advisers, to meet with the senior executive designated by
the other Party and negotiate in good faith to resolve the dispute
on an amicable basis.

(c)     If the designated senior executives fail to resolve the dispute
within ten (10) business days after the initial request that they
meet to resolve the dispute in accordance with subsection (b) above,
or mutually conclude in good faith that resolution through such
negotiations does not appear likely, then, upon the request of
either Party, the dispute will be submitted to non-binding mediation
as set forth herein. In the mediation process, the Parties will try
to resolve their differences voluntarily with the aid of an
impartial mediator, who will attempt to facilitate negotiations. The
mediator will be selected by agreement of the Parties. If the
Parties cannot agree on a mediator, a mediator will be designated by
the American Arbitration Association or JAMS/Endispute, or other
mutually acceptable reputable dispute resolution firm, at the
request of either Party. Any mediator so designated must be
acceptable to both Parties. The mediation will be conducted as
specified by the mediator and agreed upon by the Parties. The
Parties agree to discuss their differences in good faith and to
attempt, with the assistance of the mediator, to reach an amicable
resolution of the dispute. The mediation will be treated as a
settlement discussion and therefore will be confidential. The
mediator may not testify for either Party in any later proceeding
relating to the dispute. No recording or transcript shall be made of
the mediation proceedings. The mediation shall be conducted in
Chicago, Illinois. Each Party shall, except as otherwise provided
herein, be responsible for its own expenses, including legal fees,
incurred in the course of the dispute resolution period and
mediation. The fees of the mediator shall be divided evenly between
the Parties.

(d)     Neither Party may commence any legal action arising out of this
Agreement until thirty (30) days after the commencement of the
mediation as set forth above, or such shorter period as the Parties
may mutually agree in writing. Notwithstanding the foregoing
provisions of this Section 8.5, either Party may seek interim
judicial relief, including injunctions, specific performance, and
other equitable remedies, to the extent necessary to preserve the
status quo or prevent irreparable injury until any related dispute
can be resolved as provided in this Section 8.5.

(e)     Any action or proceeding seeking to enforce any provision of, or
based on any right arising out of, this Agreement may be brought
against either Party only in the appropriate state or federal courts

located in Cook County, Illinois. Each Party consents to the exclusive jurisdiction of such courts (and of the appropriate

15

<Page>

appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

ARTICLE IX
MISCELLANEOUS

9.1   ASSIGNMENT. This Agreement will be binding upon, and inure to the benefit of, the Parties and their respective successors and assigns. However, neither Party may, without the prior written consent of the other, assign or transfer this Agreement, or any of its rights or obligations under this Agreement, to any person or entity other than one who (i) merges, consolidates, or otherwise combines with that Party or otherwise acquires all or substantially all of the operating assets of that Party, and (ii) agrees or otherwise becomes legally obligated to comply with and be bound by the provisions of this Agreement to the same extent as that Party.

9.2   NOTICES. Any notice required or permitted by this Agreement will be deemed given (i) when delivered, if delivered by hand or by facsimile (transmission confirmed), (ii) on the next business day, if sent by overnight courier service for next business day delivery, or (iii) on the third business day, if sent by prepaid United States mail, return receipt requested, in each case to the applicable Party at the address or facsimile number specified as follows:

        If to Orbitz:

                Orbitz, LLC
                200 South Wacker Drive, 19th Floor
                Chicago, Illinois 60606
                Attention:   President

                Facsimile No.: 312-632-1592

          with a copy to:

                Orbitz, LLC
                200 South Wacker Drive, 19th Floor
                Chicago, Illinois 60606
                Attention:   General Counsel

                Facsimile No.: 312-632-1592

        If to WORLDSPAN:

                Worldspan, L.P.
                300 Galleria Parkway, N.W.
                Atlanta, Georgia 30339
                Attention: President and Chief Executive Officer

                Facsimile No.: 770-563-7878

                16

<Page>

with a copy to:

Worldspan, L.P.
300 Galleria Parkway, N.W.
Atlanta, Georgia 30339
Attention: General Counsel

Facsimile No.: 770-563-7878

Either Party may change its address or facsimile number for notice purposes by giving the other Party prior written notice of the new address and/or facsimile number and the date upon which the change will be effective.

9.3     FORCE MAJEURE. Neither Party will be responsible or liable for, and that Party will be excused from, any non-performance or delay in the performance of any of its non-monetary obligations under this Agreement if and to the extent that such non-performance or delay (i) is caused by an act of God, natural disaster, civil disturbance, or any other factor beyond the control of that Party, whether or not foreseeable, and (ii) could not have been prevented by that Party's taking normal and customary precautions. In the event that either Party is excused from the performance of its obligations pursuant to this Section, then that Party will use all efforts that are practicable under the circumstances to resume performance of its obligations as soon as feasible.

9.4     FURTHER ASSURANCES. Each Party agrees to execute, acknowledge, and deliver such further instruments and documents, and to do such other acts and things, as may be required by law or reasonably requested by the other Party to carry out the full intent and purposes of this Agreement.

9.5     PRESS RELEASES. Neither Party will issue any press release or other public communication that mentions the other, or uses any copyright, trademark, service mark, or trade name of the other, without the prior approval of the other, except that each Party may make announcements intended solely for internal distribution at that Party and may make any disclosure required by legal, accounting, or regulatory requirements beyond the reasonable control of that Party.

9.6     NON-SOLICITATION. Each Party agrees that, during the Term of this Agreement and for one (1) year thereafter, neither it nor any affiliate of it will, except with the prior written consent of the other Party, solicit for employment any individual employed then or within the preceding twelve (12) months by the other Party or any affiliate of the other Party if that individual was involved in the performance of this Agreement. The foregoing shall not restrict the general solicitation or recruiting activities by either Party.

9.7     THIRD PARTY BENEFICIARIES. This Agreement is for the benefit of the Parties and is not intended to confer any rights or benefits on any third party, including any employee or creditor of either Party.

17

<Page>

9.8     NO WAIVER; CUMULATIVE REMEDIES. No delay on the part of either Party in exercising any right, power or privilege hereunder will operate as a waiver thereof. No waiver on the part of either Party of any such right, power or privilege will preclude any further exercise thereof or the exercise of any other such right, power or privilege. All remedies

representative in the course of such inspection shall be subject to the confidentiality requirements of this Agreement.

IN WITNESS WHEREOF, each of Orbitz and WORLDSPAN has caused this Agreement to be executed by its duly authorized representative.

ORBITZ, LLC                          WORLDSPAN, L.P.


By:    /s/ Steve Hafner             By:    /s/ Susan J. Powers

Title: VP - Business Development    Title: SVO-E-Commerce

                                           19
<Page>


SCHEDULE A

DEFINITIONS

1.   "Adjusted Segment Fee" means, for any Net Segment and any month, (i) the product of (x) the Base Segment Fee for that Net Segment and that month, multiplied by (y) the PowerShopper Percentage for that month, plus (ii) if any Performance-Based Segment Fee is applicable to that Net Segment for that month in accordance with the provisions of Schedule B, the amount of that Performance-Based Segment Fee.

2.   "Aggregate Segments" means, for any applicable time period, the sum of (i) the Net Segments for that period, plus (ii) the number of direct or through flights booked during that period by means of the Orbitz Website through the WORLDSPAN System for which WORLDSPAN does not receive discrete payments from the applicable air carrier, as determined by the WORLDSPAN System, plus (iii) any other segments mutually agreed upon by Orbitz and Worldspan.

3.   "Air Segment" means each direct or through flight booked by means of the Orbitz Website through the WORLDSPAN System for which WORLDSPAN receives a discrete payment from the applicable air carrier, as determined by the WORLDSPAN System.

4.   "Airline Direct Connect Segment" means an Air Segment that is designated by an air carrier, Worldspan and Orbitz as constituting an Airline Direct Connect Segment.

5.   "Available" means, with respect to the WORLDSPAN System, that the central site hardware and software of the WORLDSPAN System is capable of performing its intended functions and of processing at least [***] of the normally expected daily message volumes, as determined from the previous month's statistics.

6.   "Base Segment Fee" means, for any calendar month, (i) for a Net Car Segment or a Net Hotel Segment, $[***], and (ii) for a Net Air Segment, the amount set forth in the following table for the number of Net Segments for the Contract Year in which that month falls (which number for any partial Contract Year in the Term of this Agreement will be annualized).

<Table>
<Caption>

| CONTRACT YEAR NET SEGMENTS | NET AIR SEGMENT BASE SEGMENT FEE |
|---|---|

| | |
|---|---|
| <S> | <C> |
| [***] or more | $ [***] |
| [***] to [***] | $ [***] |
| [***] or less | $ [***] |

</Table>

----------

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

<Page>

Effective as of August 1, 2003, "Base Segment Fee" means, for any calendar month, (i) for a Net Car Segment, the amount set forth in Table 1 for the number of Net Car Segments for the Contract Year in which that month falls (which number for any partial Contract Year in the Term of this Agreement will be annualized, and (ii) for a Net Air Segment, the amount set forth in Table 2 for the number of Net Air Segments for the Contract Year in which that month falls (which number for any partial Contract Year in the Term of this Agreement will be annualized), and (iii) for a Net Hotel Segment, the amount set forth in Table 3 for the number of Net Hotel Segments for the Contract Year in which that month falls (which number for any partial Contract Year in the Term of this Agreement will be annualized):

Table 1

<Table>
<Caption>

| CONTRACT YEAR NET CAR SEGMENTS | NET CAR SEGMENT BASE SEGMENT FEE |
|---|---|
| <S> | <C> |
| [***] or more | $ [***] |
| [***] to [***] | $ [***] |
| [***] or less | $ [***] |

</Table>

Table 2

<Table>
<Caption>

| CONTRACT YEAR NET AIR SEGMENTS | NET AIR SEGMENT BASE SEGMENT FEE |
|---|---|
| <S> | <C> |
| [***] or more | $ [***] |
| [***] to [***] | $ [***] |
| [***] to [***] | $ [***] |
| [***] or less | $ [***] |

</Table>

----------

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

<Page>

Table 3

<Table>
<Caption>

| CONTRACT YEAR NET HOTEL SEGMENTS | NET HOTEL SEGMENT BASE SEGMENT FEE |
|---|---|
| <S> | <C> |
| [***] or more | $ [***] |
| [***] to [***] | $ [***] |
| [***] to [***] | $ [***] |
| [***] to [***] | $ [***] |
| [***] or less | $ [***] |

</Table>

Notwithstanding the Base Segment Fees set forth in Table 2, in the event Worldspan increases Booking Fees payable to Worldspan by air carriers for Air Segments booked in the United States via the Orbitz Website above the Booking Fees in effect as of December 31, 2003 then the revenue share for Net Air Segments set forth in Table 2 shall be increased by [***] by which such Booking Fees have increased above the Booking Fees payable as of December 31, 2003. For example, assume Worldspan increases Booking Fees for Air Segments booked in the United States via the Orbitz Website on January 1, 2004 by 4%, the Net Air Segment Base Segment Fee set forth in Table 2 shall be increased by [***]% ([***] of 4%).

In the event Worldspan decreases by ten percent (10%) or more on a cumulative basis, the Booking Fees payable to Worldspan by air carriers for Air Segments booked in the United States via the Orbitz Website based on market conditions or for competitive purposes below the Booking Fees in effect as of December 31, 2003, then the parties will renegotiate the revenue share payable to Orbitz for Air Segments. If the parties are unable to agree on a new revenue share within twelve (12) months following the decrease in Booking Fees that triggers the renegotiation, then the revenue share set forth in Table 2 shall be decreased by [***] by which such rate has decreased below the rate payable as of December 31, 2003. For example, assume Worldspan decreases Booking Fees in 2004 and 2005 and such decreases result in a cumulative 10% decrease in the Booking Fees for Air Segments that were in effect as of December 31, 2003 and the parties are unable to agree to a new revenue share after twelve (12) months of negotiation, the Base Segment Fees set forth in Table 2 shall be decreased by [***]% ([***] of 10%).

Notwithstanding the foregoing, in the event Worldspan calculates charges for services rendered to participating carriers based upon units of measure other than Booking Fees, the parties shall have the right to renegotiate the revenue share in Table 2 for Air Segments generated by Orbitz Users.

7. "Booking Engine Providers" means Datalex Limited or any other company that Orbitz may engage from time to time to provide the booking engine for the Orbitz Website.

----------

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

<Page>

8. "Booking Fees" means the rates charged by Worldspan to participating air carriers for airline passenger segments booked through the Worldspan System based on the participating carriers' service levels and as published by Worldspan from time to time. Booking Fees do not include usage fees, fees for special services, or other ancillary fees.

9. "Car Segment" means each car rental booked by means of the Orbitz Website through the WORLDSPAN System for which WORLDSPAN receives a discrete payment from the applicable car rental company, as determined by the WORLDSPAN System.

10. "Change-in-Control" shall be deemed to exist if affiliates of Delta Air Lines, Inc. ("Delta"), Northwest Airlines, Inc. ("Northwest") or American Airlines, Inc. ("American") collectively no longer hold more than fifty percent (50%) of the voting interest in Worldspan or if Worldspan is combined with another entity of which affiliates of Delta, Northwest and/or American collectively do not hold more than fifty percent (50%) of the voting interests of the combined entity. In addition, a "Change-in-Control will be deemed to exist if more than fifty percent (50%) of the voting interest of Worldspan is acquired by another CRS. Notwithstanding any of the foregoing, an initial public offering of Worldspan shall not constitute a "Change-in-Control."

11. "Charter Airline" means the air carrier set forth in Schedule D for the period set forth in Schedule D.

12. "Contract Manager" has the meaning specified in Section 5.1.

13. "Contract Year" means a 12-month period of time commencing on the January 1 or any anniversary thereof, provided that the initial Contract Year shall be a partial year commencing on the Effective Date and continuing through December 31, 2001. Notwithstanding the foregoing, for purposes of Section 4.3(a), the initial Contract Year shall be a partial year retroactive to June 4, 2001 and continuing through December 31, 2001.

14. "Confidential Information" means, with respect to either Party, any proprietary business or technical information of that Party, including any know-how, data, drawings, specifications, software, listings, source code, object code, customer lists, financial information, business plans, marketing concepts, and business relationships, including the terms of this Agreement, regardless of the form in which such information is communicated or maintained and whether or not such information constitutes a trade secret. However, Confidential Information will not include any information that (i) at the time of disclosure by the disclosing Party was already rightfully known by the receiving Party without any obligation of confidentiality, (ii) is or becomes generally available to the public other than through any wrongful act or omission by the receiving Party, (iii) is developed by the receiving Party independently of any Confidential Information it may have received from the disclosing Party, or (iv) the receiving Party receives from a third party free to make such disclosure without breach of any legal obligation.

A - 4

<Page>

15. "CRS" means a computer reservations system operated by WORLDSPAN, Sabre, Galileo, Amadeus, Abacus, Infini, Axxess, or any other company that operates such a system in order to provide information about the schedules, fares, rates, and availability of the products and services of

travel suppliers and to enable the making of reservations and the issuance of tickets for such products and services, but excluding a travel supplier's own systems to the extent such travel supplier's own systems are used to provide information and enable the making of reservations and the issuance of tickets of that particular travel supplier.

16. "CRS Segment" means each (a) direct or through flight, (b) car rental or (c) hotel stay, to the extent any of the foregoing is booked by means of the Orbitz Website through a CRS. "CRS Segment" does not include an Airline Direct Connect Segment.

17. "Corporate User" means any corporation, partnership, limited liability company or other business entity to whom Orbitz provides travel related services for such entity's own internal use via a corporate travel-oriented micro site of the Orbitz Website developed, owned and operated by Orbitz.

18. "Customer Service Center Provider(s)" means Precision Response Corporation or any other company or companies that Orbitz may engage from time to time to provide customer service center services for the Orbitz Website.

19. "Daily Average Internal Response Time" means, for each day, (i) for Standard Messages, the average of the Internal Response Times for all Standard Messages received by the WORLDSPAN System during the Peak Period for that day, and (ii) for PowerShopper Messages, the average of the Internal Response Times for all PowerShopper Messages received by the WORLDSPAN System during the Peak Period for that day.

20. "Domestic Air Travel" means air travel for which both the departing and arriving locations, as well as any intermediate stops, are within the 48 contiguous states of the continental United States.

21. "Domestic Fares Provider(s)" means ITA Software, Inc. or any other company or companies that Orbitz may engage from time to time to provide Domestic Air Travel fares and pricing information for the Orbitz Website.

22. "Effective Date" has the meaning specified in Section 1.2.

23. "Fulfillment Provider(s)" means e-Travel Experts, Inc. or any other company or companies that Orbitz may engage from time to time to provide fulfillment services for the Orbitz Website.

24. "Hotel Segment" means each hotel stay booked by means of the Orbitz Website through the WORLDSPAN System for which WORLDSPAN receives a discrete payment from the applicable hotel company, as determined by the WORLDSPAN System.

A - 5

<Page>

25. "Internal Response Time" means, for a given Message, the elapsed time from the time that the last character of the incoming Message is received by a network terminating device at WORLDSPAN's data center until the time that the first character of the reply is received by a network terminating device at WORLDSPAN's data center.

26. "Material Service Level Failure" means any of the following:

    (a) The Monthly System Availability of the WORLDSPAN System is below [***]% for any [***] calendar months in any period of [***]

consecutive calendar months during the Term of this Agreement.

(b) The Monthly System Availability of the WORLDSPAN System is below [***]% for any calendar month during the Term of this Agreement and has been below [**]% for one or more previous calendar months during the Term of this Agreement.

(c) The Monthly Average Internal Response Time for Standard Messages is greater than [***] seconds for any calendar month during the Term of this Agreement and has been greater than [***] seconds for ten or more previous calendar months during the Term of this Agreement.

(d) The Monthly Average Internal Response Time for PowerShopper Messages is greater than [***] seconds for any calendar month during the Term of this Agreement and has been greater than [***] seconds for ten or more previous calendar months during the Term of this Agreement.

(e) WORLDSPAN fails to substantially comply with any applicable Service Level set forth in Section 3 of Schedule B more than [***] times during any period of [***] consecutive calendar months during the Term of this Agreement.

27. "Message" means each electronic transmission to the WORLDSPAN System generated by the Response Time Monitor, Orbitz, the Orbitz Website, any employee, agent, or contractor of Orbitz, or any User, and the associated response. The types of Messages as of the Effective Date are set forth on Schedule C.

28. "Migration Costs" mean the increased costs incurred by Orbitz for hardware and software necessitated by the migration from the system and platform operated by Worldspan immediately prior to a Change-in-Control to Worldspan's successor system and platform. Migration Costs also include applications development efforts incurred by Orbitz and required to migrate the then existing Orbitz product to Worldspan's successor computer reservation system.

29. "Monthly Average Internal Response Time" means, for each calendar month, (i) for Standard Messages, the average of the Daily Average Internal Response Times for Standard Messages for all days in that month, and (ii) for PowerShopper Messages, the

----------

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

<Page>

average of the Daily Average Internal Response Times for PowerShopper Messages for all days in that month.

30. "Monthly System Availability" means, for each calendar month, the percentage obtained by dividing (i) the aggregate time that the WORLDSPAN System is Available during that month, by (ii) the total time during that month less any Scheduled Downtime during that month and any time during that month that the WORLDSPAN System was not Available as a result of unplanned telecommunication outages or other causes outside of WORLDSPAN's control.

31. "Net Air Segments" means, for any applicable time period, the number of Air Segments booked during that period less the number of Air Segments cancelled during that period, as determined by the WORLDSPAN System. "Net Air Segments" shall not include Airline Direct Connect Segments.

32. "Net Car Segments" means, for any applicable time period, the number of Car Segments booked during that period less the number of Car Segments canceled during that period, as determined by the WORLDSPAN System.

33. "Net Hotel Segments" means, for any applicable time period, the number of Hotel Segments booked during that period less the number of Hotel Segments cancelled during that period, as determined by the WORLDSPAN System.

34. "Net Segments" means, for any applicable time period, all of the Net Air Segments, Net Car Segments, and Net Hotel Segments for that period.

35. "Orbitz" has the meaning specified in the introductory paragraph of this Agreement.

36. "Orbitz Information" means any and all information accumulated or otherwise obtained by WORLDSPAN arising out of or in connection with and reflecting an individual User's use of the Orbitz Website, including, without limitation, User contact and profile information, User usage patterns, and User preferences, and all information identifiable to Orbitz arising out of the usage and operation of the WORLDSPAN System in conjunction with the Orbitz Website, including any associated response time or performance monitoring information that is specific to Orbitz, but not including more comprehensive information reflecting the overall usage and operation of the WORLDSPAN System, which information may include, but shall not be limited to, such usage and operation in conjunction with the Orbitz Website.

37. "Orbitz Website" means the consumer-oriented Internet travel portal to be developed, owned, and operated by Orbitz, including any related or successor Internet sites.

38. "Party" has the meaning specified in the preamble of this Agreement.

39. "Peak Period" means, for each 24 hour day, the period of two consecutive hours during that day when the WORLDSPAN System processes the most messages.

A - 7

<Page>

40. "Performance-Based Segment Fee" means any amount determined as such in accordance with the applicable provisions of Schedule B.

41. "PowerShopper Average" means, for any calendar month, the number obtained by dividing (i) the number of PowerShopper Messages received by the WORLDSPAN System during that month, by (ii) the number of Net Air Segments booked through the WORLDSPAN System during that month.

42. "PowerShopper Message" means a Message received by the WORLDSPAN System that accesses or initiates PowerShopper, Power Pricing, Low Fare Finder, or any similar functionality that finds the lowest or most suitable fare within the WORLDSPAN System.

43. "PowerShopper Percentage" means, with respect to a given calendar month, (i) for each month until the beginning of the Term of this Agreement,

100%, and (ii) for each month thereafter, the percentage set forth in the following table for the PowerShopper Average for that month.

<Table>
<Caption>

| POWERSHOPPER AVERAGE | POWERSHOPPER PERCENTAGE |
|---|---|
| <S> | <C> |
| [***] or less | [***]% |
| more than [***], but no more than [***] | [***]% |
| more than [***], but less than [***] | [***]% |
| [***] or more | [***]% |

</Table>

44. "Response Time Monitor" has the meaning specified in Section 2(d) of Schedule B.

45. "Scheduled Downtime" means any periods of time when the WORLDSPAN System is scheduled to not be Available; provided, however, that Scheduled Downtime may not include more than 6 periods during any calendar year, each of which periods can be no longer than 20 minutes in duration starting at 2300 hours, Eastern time, on a Saturday.

46. "Segment" means an Air Segment, Car Segment, or Hotel Segment.

47. "Service Level" means any Service Level set forth in Schedule B.

48. "Standard Message" means any Message other than a PowerShopper Message.

49. "Term" has the meaning set forth in Section 1.2.

50. "User" means any person who uses the Orbitz Website.

----------

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

<Page>

51. "Weighted Message Unit" means a unit of measurement for Messages that reflects the respective average amount of computer and related resources required for the WORLDSPAN System to process Messages of various types, as determined in accordance with the methodology used by WORLDSPAN in the ordinary course of its business for that purpose. The number of Weighted Message Units for a given Message is determined by the Message Weight for that type of Message. Unless and until the Parties otherwise mutually agree, the Message Weight for each of the types of Messages set forth on Schedule C will be as set forth on Schedule C. However, as WORLDSPAN adds new functionality to the WORLDSPAN System, it may establish new types and categories of Messages and, for each new type or category of Message, determine a Message Weight that is reasonably based on the average amount of computer and related resources required for the WORLDSPAN System to process that type of Message, as compared to other types of Messages.

52. "WORLDSPAN" has the meaning specified in the introductory paragraph of this Agreement.

53. "WORLDSPAN Actual Cost" means, for any resource, expense, or activity, the

actual cost or out-of-pocket expense reasonably incurred by WORLDSPAN for that resource, expense, or activity, all as determined on the basis of the cost collection and allocation methodology that WORLDSPAN uses to determine its actual costs for purposes of its applicable transactions with its best customers or airline owners, including Delta Air Lines, Inc. and Northwest Airlines, Inc., whichever results in the lowest charge to Orbitz, and shall not include any markup or other profit.

54. "WORLDSPAN System" means the computer reservations systems operated by WORLDSPAN and containing the following functionality:

   (a)   Mainframe transaction processing and electronic distribution of travel information, such as schedules, availability, fares, pricing, and negotiated rates for various travel suppliers.

   (b)   Providing booking capability for air, car, and hotel reservations and other travel-related services.

   (c)   Enabling the issuance of paper and electronic tickets and other travel-related documents.

A - 9

<Page>

## SCHEDULE B

## SERVICE LEVELS

1.   SYSTEM AVAILABILITY.

   The Service Level for System Availability is for the Monthly System Availability of the Worldspan System to be at least [***]% during each calendar month during the Term of this Agreement.

   In the event that the Monthly System Availability of the Worldspan System is less than [***]% during any calendar month during the Term of this Agreement, the Parties agree that Orbitz will be damaged in an amount that, as of the date hereof, is difficult to determine with certainty. Therefore, as liquidated damages, and not as a penalty, Worldspan will pay to Orbitz, for each Net Segment for that month, a Performance-Based Segment Fee determined in accordance with the following:

<Table>
<Caption>

| MONTHLY SYSTEM AVAILABILITY | PERFORMANCE-BASED SEGMENT FEE |
|---|---|
| <S> | <C> |
| [***]% and above | None |
| Below [***]% but no lower than [***]% | $   [***] |
| below [***]%, but no lower than [***]% | $   [***] |
| below [***]% | $   [***] |

</Table>

2.   INTERNAL RESPONSE TIME.

   (a)   STANDARD MESSAGES. The Service Level for Internal Response Time for Standard Messages is for the Monthly Average Internal Response Time for Standard Messages for each calendar month during the Term of this Agreement to be no more than [***] seconds.

In the event that the Monthly Average Internal Response Time for Standard Messages for any calendar month during the Term of this Agreement is greater than [***] seconds, the Parties agree that Orbitz will be damaged in an amount that, as of the date hereof, is difficult to determine with certainty. Therefore, as liquidated damages, and not as a penalty, WORLDSPAN will pay Orbitz, for each Net Segment for each day during that month for which the Daily Average Internal Response Time for Standard Messages is greater than [***] seconds, a Performance-Based Segment Fee determined in accordance with the following:

----------

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

B - 1

<Page>

<Table>
<Caption>

| DAILY AVERAGE INTERNAL RESPONSE TIME | PERFORMANCE-BASED SEGMENT FEE |
|---|---|
| <S> | <C> |
| [***] seconds and below | None |
| more than [***] seconds, but no more than [***] seconds | $ [***] |
| more than [***] seconds, but no more than [***] seconds | $ [***] |
| more than [***] seconds | $ [***] |

</Table>

(b) POWERSHOPPER MESSAGE. The Service Level for Internal Response Time for PowerShopper Messages is as follows:

(1) For each calendar month during the Term of this Agreement during which WORLDSPAN does not provide Domestic Air Travel fares and pricing information for the Orbitz Website, the Monthly Average Internal Response Time for PowerShopper Messages will be no more than [***] seconds.

In the event that the Monthly Average Internal Response Time for PowerShopper Messages for any such calendar month during the Term of this Agreement is greater than [***] seconds, the Parties agree that Orbitz will be damaged in an amount that, as of the date hereof, is difficult to determine with certainty. Therefore, as liquidated damages, and not as a penalty, WORLDSPAN will pay Orbitz, for each Net Segment for each day during that month for which the Daily Average Internal Response Time for PowerShopper Messages is greater than [***] seconds, a Performance-Based Segment Fee determined in accordance with the following:

<Table>
<Caption>

| DAILY AVERAGE INTERNAL RESPONSE TIME | PERFORMANCE-B SEGMENT FE |
|---|---|

<S> <C>

| | |
|---|---|
| [***] seconds and below | None |
| more than [***] seconds, but no more than [***] seconds | $ [*** |
| more than [***] seconds, but no more than [***] seconds | $ [*** |
| more than [***] seconds | $ [*** |

</Table>

(2) For each calendar month during the Term of this Agreement during which WORLDSPAN does provide Domestic Air Travel fares and pricing information for the Orbitz Website, the Monthly Average Internal Response Time for PowerShopper Messages will be no more than [***] seconds.

----------

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

<Page>

In the event that the Monthly Average Internal Response Time for PowerShopper Messages for any such calendar month during the Term of this Agreement is greater than [***] seconds, the Parties agree that Orbitz will be damaged in an amount that, as of the date hereof, is difficult to determine with certainty. Therefore, as liquidated damages, and not as a penalty, WORLDSPAN will pay Orbitz, for each Net Segment for each day during that month for which the Daily Average Internal Response Time for PowerShopper Messages is greater than [***] seconds, a Performance-Based Segment Fee determined in accordance with the following:

<Table>
<Caption>

| DAILY AVERAGE INTERNAL RESPONSE TIME | PERFORMANCE-B SEGMENT FE |
|---|---|
| <S> | <C> |
| [***] seconds and below | None |
| more than [***] seconds, but no more than [***] seconds | $ [*** |
| more than [***] seconds, but no more than [***] seconds | $ [*** |
| more than [***] seconds | $ [*** |

</Table>

(c) UNFORECAST DEMAND. Notwithstanding anything to the contrary, if the number of Net Segments booked by means of the Orbitz Website through the WORLDSPAN System during any calendar month exceeds by [***]% or more the number of Net Segments forecast for that month by Orbitz in accordance with the capacity planning process described in Section 3.3 of this Agreement, then the foregoing provisions of this Section 2 will not be applicable, any failure to meet the Service Level for Internal Response Time for Standard Messages and/or PowerShopper Messages for that month will not be considered for determining the occurrence of a Material Service Level Failure, and WORLDSPAN will not be required to pay any Performance-Based Segment Fees based on

| 1 | Serious business impact, e.g., message response times materially exceeding Service Levels | 1 hour response time fix in 4 hours, with |
| 2 | Less serious business impact, e.g., flight information unavailable | 2 hour response time fix in 8 hours, with hours |
| 3 | Nuisance, e.g., unable to retrieve non-critical backup information | 24 hour response tim resolve in one week, updates. |

</Table>

4.  CHANGE MANAGEMENT. The Parties will develop and mutually agree upon a change management process that will, among other things, provide for the following:

    (a)  WORLDSPAN will notify Orbitz of any scheduled changes to the WORLDSPAN System that are reasonably anticipated to materially affect Orbitz at least three days prior to the change and will consult with Orbitz's operations staff as to the timeframe for the change.

B - 4

<Page>

    (b)  Orbitz will notify WORLDSPAN of any scheduled changes to Orbitz's systems or business operations (e.g., promotions) that are reasonably anticipated to materially affect WORLDSPAN at least three days prior to the change and will consult with WORLDSPAN's operations staff as to the timeframe for the changes.

    (c)  Notwithstanding the foregoing, the Parties may make emergency changes that are required to protect the integrity of their respective systems without giving the notice described above, but each Party will use reasonable business efforts to notify the other of any such emergency change as soon as practicable.

5.  FUNCTIONALITY. WORLDSPAN agrees to use reasonable business efforts so that the functionality included within the WORLDSPAN System that is necessary for Orbitz's business operations continues to be fully functional. In particular, WORLDSPAN agrees to work with Orbitz to ensure that a viable method for private faring (web-fares) can be properly run on the WORLDSPAN System.

6.  EQUIVALENT SERVICES. In addition to the specific Service Levels specified above, during the Term of this Agreement:

    (a)  WORLDSPAN will provide Orbitz with Monthly System Availability that is equivalent to or better than that provided to any other WORLDSPAN customer using the WORLDSPAN System via the Internet. Subject to confidentiality restrictions, Orbitz will have access to all Monthly System Availability metrics and Monthly System Availability measurement tools available to WORLDSPAN.

    (b)  WORLDSPAN will provide Orbitz with Internal Response Time that is equivalent to or better than that provided to any other WORLDSPAN customer using the WORLDSPAN System via the Internet. Subject to confidentiality restrictions, Orbitz will have access to all Internal Response Time measurement tools and Internal Response Time

data that WORLDSPAN makes available to any other customer.

<Page>

SCHEDULE C

MESSAGE WEIGHTS

<Table>
<Caption>

| MESSAGE TYPE | MESSAGE WEIGHT |
|---|---|
| <S> | <C> |
| CATEGORY 1 | [***] |
| International PowerShopper Message | |
| CATEGORY 2 | [***] |
| Domestic PowerShopper Message | |
| CATEGORY 3 | [***] |
| Availability Schedule Display Message | |
| End Transaction Message | |
| Ticketing Fare Quotation Message | |
| Hotels Message | |
| Cars Message | |
| CATEGORY 4 | [***] |
| Passenger Data Entries Message | |
| Sell From Availability / Change Segment Status Message | |
| Flight Information Message | |
| Display Record Message | |
| File Record Message | |
| Ignore Transaction Message | |
| CRC Functions Message | |
| Special Functions List Message | |
| Move Scroll Message | |
| Queue Functions Message | |
| Program Activation By Agent Set / Misc. Testing Message | |
| Teletype Reject Line Correction Message | |
| Inventory Manipulation Message | |
| Agent Adjustment Message | |
| Repeat Display Message | |
| Message Switching Message | |
| Tours Message | |
| AAA Initialization / Maintenance Message | |

</Table>

----------

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

<Page>

```
<Table>
              <S>                                                              <C>
              Divide Party Message
              Manual Segment Entry Message
              Unsolicited Message
              Training Entries Message
              Getaway / Credit / Cash Message
              Direct Reference System Message
              Weather Commands / Flight Type Record Message
              Schedule Change Message
              PARS Commercial Bridge Message
              Transmit Function Message
              Seat Assignment Message
              Message Switching Utilities Message
              Profile Transactions / Worldfile Transactions Message
              Direct Access Message
              Credit Fraud System Message
              Direct Sell Link Message
              Mail System Message
              Timatic Message
              Answerbacks Message
              Invalid Input Function Message
              TVL Segments Message
              Help / Info Message
              Previous Entry In Progress Message
              Type B Inbound Message
              Total Direct Access Messages Sent Message
              Total Direct Link Messages Sent Message
              Total Positive Acknowledgments Received Message
              Total Direct Link AAA Comps Received Message
</Table>
```

C - 2

<Page>

## SCHEDULE D

## Charter Airlines

```
<Table>
<Caption>
                                    EFFECTIVE         EXPIRATION
                                      DATE               DATE
AIRLINE
---------------------------        -----------        -----------
<S>                                  <C>                <C>
AEROMEXICO                         18-JUN-01          17-JUN-04
AIR FRANCE                         21-MAY-01          21-MAY-02
AIR JAMAICA                        12-MAY-00          12-MAY-01
AIR NEW ZEALAND                    20-APR-01          20-APR-02
ALASKA AIR GROUP                    8-AUG-01           8-AUG-02
ALOHA                               5-JAN-01           5-JAN-04
ALL NIPPON                         13-AUG-01          13-AUG-02
AMERICAN                           19-MAY-01          17-MAY-11
ANSETT                             20-APR-01          20-APR-02
ASIANA                              2-APR-01           2-APR-02
CANADA 3000                         1-FEB-01           1-FEB-04
CATHAY PACIFIC                     12-JUL-01          12-JUL-02
CHINA AIRLINES                     16-JUL-01          16-JUL-02
CONTINENTAL                        19-MAY-01          17-MAY-11
COPA                               22-NOV-00          22-NOV-01
```

| | | |
|---|---|---|
| CSA CZECH | 22-MAY-01 | 22-MAY-02 |
| DELTA | 19-MAY-01 | 17-MAY-11 |
| EL AL | 1-AUG-01 | 1-AUG-02 |
| EVA | 15-NOV-00 | 15-NOV-01 |
| HAWAIIAN | 15-DEC-00 | 15-DEC-03 |
| IBERIA | 3-MAR-01 | 3-MAR-02 |
| JAPAN AIRLINES | 26-JUL-01 | 26-JUL-02 |
| KLM | (SAME AS NW) | |
| KOREAN AIR | 30-APR-01 | 30-APR-02 |
| LAN CHILE | 18-DEC-00 | 18-DEC-01 |
| LAN PERU | 21-MAY-01 | 21-MAY-02 |
| LOT POLISH | 1-JUN-01 | 1-JUN-02 |
| LUFTHANSA | 15-MAR-01 | 15-MAR-02 |
| MEXICANA | 15-MAY-00 | 15-MAY-03 |
| MIDWAY | 1-APR-01 | 31-MAR-04 |
| MIDWEST EXPRESS | 1-JUN-01 | 31-MAY-04 |
| NATIONAL | 7-MAY-01 | 6-MAY-04 |
| NORTHWEST | 19-MAY-01 | 17-MAY-11 |
| </Table> | | |

D - 1

<Page>

<Table>
<S>

| | <C> | <C> |
|---|---|---|
| QANTAS | 13-AUG-01 | 13-AUG-02 |
| SABENA | 1-JUN-01 | 1-JUN-02 |
| SAS | 5-JUL-01 | 5-JUL-02 |
| SINGAPORE | 29-JAN-01 | 29-JAN-02 |
| SOUTH AFRICAN AIRWAYS | 13-JUN-01 | 13-JUN-02 |
| SPIRIT | 8-JAN-01 | 8-JAN-04 |
| SWISSAIR | 1-JUN-01 | 1-JUN-02 |
| TWA | 19-MAY-01 | 17-MAY-11 |
| UNITED | 19-MAY-01 | 17-MAY-11 |
| US AIRWAYS | 27-JUN-00 | 27-JUN-03 |
| UZBEKISTAN AIRWAYS | 22-DEC-00 | 22-DEC-01 |
| VANGUARD | 5-JUN-00 | 5-JUN-03 |
| VARIG | 22-MAY-00 | 22-MAY-01 |
| VIRGIN | 16-JUL-01 | 16-JUL-02 |
| </Table> | | |

D - 2

</TEXT>
</DOCUMENT>

```
<DOCUMENT>
<TYPE>EX-10.4
<SEQUENCE>4
<FILENAME>a2124294zex-10_4.txt
<DESCRIPTION>EX-10.4
<TEXT>
<Page>
```

Exhibit 10.4

EXECUTION COPY

FIRST AMENDMENT
TO THE
AMENDED AND RESTATED AGREEMENT

FOR CRS ACCESS AND RELATED SERVICES

This FIRST AMENDMENT TO THE AMENDED AND RESTATED AGREEMENT FOR CRS ACCESS AND
RELATED SERVICES (this "Amendment"), dated as of December 13, 2002 ("Amendment
Effective Date"), is between Worldspan, L.P., a Delaware limited partnership,
("Worldspan") and Orbitz, LLC, a Delaware limited liability company ("Orbitz").

WHEREAS, Orbitz and Worldspan entered into that certain Amended and Restated
Agreement for CRS Access and Related Services dated as of November 1, 2001 (the
"Agreement"); and

WHEREAS, Orbitz and Worldspan desire to amend the Agreement as set forth herein;

NOW, THEREFORE, Orbitz and Worldspan hereby agree to amend the Agreement as
follows:

1.    The "WHEREAS" clauses are hereby restated in their entirety to provide as
follows:

      "WHEREAS, Orbitz operates various businesses offering travel-related
      products and services to the end-user community as well as to the travel
      industry;

      WHEREAS, among its other businesses, Orbitz provides travel end-users with
      a consumer-oriented Internet travel portal under the "Orbitz.com" domain
      name through which they can complete the booking of air travel, hotel
      accommodations, car rentals, and other travel products (such portal, and
      any related, private labeled or successor Internet sites, such as "Orbitz
      for Business," that are controlled by Orbitz, the "Orbitz Website");

      WHEREAS, Orbitz also provides or may in the future provide to travel
      professionals in the travel industry certain travel-related products and
      services that are not oriented to a consumer end-user and that do not use
      or access the Orbitz Website, including, without limitation, travel agent
      desktop tools and other products and services intended for use by travel
      agents, corporate travel managers and other travel professionals,
      ("Industry Services");

      WHEREAS, in connection with its Orbitz Website business, Orbitz has
      selected Worldspan to provide access to and use of the computer
      reservations systems operated by Worldspan as provided in this Agreement,
      and has selected other

```
<Page>
```

companies to provide the booking engine, fulfillment services, customer service center, and other products and services required by Orbitz for the Orbitz Website;

WHEREAS, it is the intent of the parties that this Agreement shall govern the provision of such services to Orbitz and the use of the Worldspan System, but only in connection with the Orbitz Website business, and not in connection with Industry Services or any other business that Orbitz operates or may operate."

2.    Section 2.1 is hereby restated in its entirety to provide as follows:

"2.1 CRS ACCESS. During the Term of this Agreement, Worldspan will provide Orbitz, as well as the Booking Engine Provider, the Customer Service Center Provider, the Fulfillment Provider, ITA and any other third parties that may be engaged by Orbitz to provide products or services for the operation of the Orbitz Website and that require such access in order to provide those products or services, with access to the Worldspan System (including, without limitation, Availability Data Services) for the purposes of the operation of the Orbitz Website and in accordance with the provisions of this Agreement. Orbitz is authorized to access Availability Data Services, for the purposes of processing any Supplier Link Segments as set forth in Sections 2.10 and 4.7 herein and as otherwise in a manner that is consistent with this Agreement."

3.    A new Section 2.10 is hereby added to the Agreement to provide as follows:

"2.10 AUTHORIZATION TO USE THE AVAILABILITY DATA SERVICES FOR SUPPLIER LINK SEGMENTS.

(a)    During the Term of this Agreement and subject to Section 4.7, Worldspan will provide Orbitz, as well as the Booking Engine Provider, the Customer Service Center Provider, the Fulfillment Provider, ITA and any other third parties that may be engaged by Orbitz to provide products or services for the operation of the Orbitz Website, access to the Availability Data Services in connection with an Orbitz offering made to any User using the Orbitz Website; provided, however, that Orbitz is not authorized to access the Worldspan System or the Availability Data Services in connection with any contract or agreement with a Worldspan Customer for the purpose of providing such Worldspan Customer access to the Orbitz Website, unless Orbitz has obtained Worldspan's prior written consent. For the avoidance of doubt, the license in the previous sentence does not authorize the use or remarketing of Availability Data Services other than for the Orbitz Website.

(b)    Orbitz may terminate use of the Availability Data Services upon 60 days' prior written notice to Worldspan. Worldspan may terminate provision of the Availability Data Services to or on behalf of Orbitz upon the earlier of (i) termination of use of such services by Orbitz or ITA, or (ii) the end of any period specified in an Orbitz notice electing to use such services."

2

<Page>

4.    Section 3.2 is hereby restated in its entirety to provide as follows:

"USE OF WORLDSPAN SYSTEM. Orbitz has incorporated the Worldspan System into the Orbitz Website and will use reasonable business efforts to encourage

Users to book travel by means of the Orbitz Website so as to generate Net Segments booked through the Worldspan System. For the avoidance of doubt, the foregoing sentence shall not impair or restrict Orbitz' right to encourage Users to book travel through Supplier Link Segments, provided that such bookings are consistent with Orbitz' obligations under this Agreement.

(a) Effective January 1, 2003, Orbitz agrees (i) to cause not less than one hundred percent (100%) of all Non-Direct Connect Car Segments and (ii) to cause not less than one hundred percent (100%) of all Airline Non-Direct Connect Segments booked on behalf of all Users, including Corporate Users, by means of the Orbitz Website to be booked through the Worldspan System.

(b) In the event the number of Adjusted Quarterly Net Segments booked through the Worldspan System falls below the Applicable Quarterly Minimum set forth below in any calendar quarter commencing with the calendar quarter beginning January 1, 2003, Orbitz shall pay Worldspan the Minimum Segment Fee set forth in Section 4.8(a) in accordance with the payment terms set forth therein.

<Table>
<Caption>

| CALENDAR QUARTER | APPLICABLE QUARTERLY MINIMUM |
|---|---|
| <S> | <C> |
| Quarter ending March 31 | [***] |
| Quarter ending June 30 | [***] |
| Quarter ending September 30 | [***] |
| Quarter ending December 31 | [***] |

</Table>

For purposes of the foregoing calculation, the number of Net Segments (if any) by which the Applicable Quarterly Minimum is exceeded in a particular calendar quarter shall be carried forward and applied to the next subsequent calendar quarter in such calendar year. The number of Net Segments in a particular calendar quarter plus the number of excess Net Segments, if any, carried forward from the previous calendar quarter(s) in such calendar year shall be referred to as the "Adjusted Quarterly Net Segments." With respect to the calendar quarter ending March 31, the Adjusted Quarterly Minimum shall equal the number of actual Net Segments booked through the Worldspan System during such calendar quarter. For illustration, if the number of Net Segments achieved in the calendar quarter ending March 31 is [***], thus exceeding the Applicable Quarterly Minimum for such quarter by 1,000,000, then the Adjusted Quarterly Net Segments for the quarter ending June 30 shall be the number of Net Segments

----------

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

<Page>

actually achieved in such quarter, plus 1,000,000, and to the extent this Adjusted Quarterly Net Segments value exceeds the Applicable Quarterly Minimum of [***] Net Segments for the quarter ending June 30, such excess shall be applied toward the Adjusted Quarterly Net Segment calculation for the quarter ending September 30. No such excess shall be carried forward

into a subsequent calendar year or backwards to a previous calendar year.

Notwithstanding the foregoing, no Minimum Segment Fee shall be payable by Orbitz for a given calendar quarter, even if the total number of Adjusted Net Segments in such calendar quarter does not equal or exceed the Applicable Quarterly Minimum, if, either (i) Orbitz has not booked any Airline Direct Connect Segments or Direct Connect Car Segments in such calendar quarter and processes 100% of Orbitz' air and car bookings through Worldspan, or (ii) (A) a Safe Harbor Event has occurred, (B) Orbitz has provided notice to Worldspan of such Safe Harbor Event within 20 days following its occurrence, (C) Orbitz has not provided notice to Worldspan of a prior Safe Harbor Event during such calendar year, and (D) beginning on the fifth business day following Orbitz' provision of such notice to Worldspan, for the remainder of the calendar quarter and until the end of the calendar year (or such earlier time as Orbitz declares, by written notice to Worldspan, the conclusion of the Safe Harbor Event), Orbitz has eliminated all Airline Direct Connect Segments and all Direct Connect Car Segments and processes 100% of Orbitz' air and car bookings through Worldspan.

(c) Orbitz agrees that it will not directly or indirectly acquire or use any products or services from a CRS other than Worldspan to support or use with the Orbitz Website for Airline Direct Connect Customers or Direct Connect Car Customers. Notwithstanding the foregoing, if Worldspan eliminates a product or service used by Orbitz and does not replace it with a comparable product or service on commercial terms no less favorable to Orbitz, Orbitz may obtain a replacement product or service from another CRS. Orbitz will use reasonable business efforts to prevent unauthorized or improper use of or access to the Worldspan System and to ensure that its employees, agents, third parties that may be engaged by Orbitz to provide products or services for the operation of the Orbitz Website, and Users access and use the Worldspan System in compliance with all reasonable instructions provided by Worldspan, including the following:

(i) The Worldspan System may not be used to transmit personal messages, make speculative or improper bookings, train anyone other than Orbitz employees, agents, or Users, or publish or disseminate a compilation of air carrier service or other information.

Proper and permitted use of the Worldspan System, including data and services provided through such system, consists of (i) using the

----------

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

<Page>

Availability Data Services with respect to one or more Airline Direct Connect Customers for purposes of and consistent with this Agreement, (ii) making proper and legitimate reservations and booking Segments, (iii) issuing travel documents related to such Segments, and (iv) performing normal accounting and record keeping functions, all of the foregoing only in accordance with rules and regulations issued from time to time by Worldspan and subject to the terms and conditions of this Agreement. Improper use of the Worldspan System includes, without limitation, making speculative or improper bookings, reserving space in anticipation of demand, and

improper creation or modification of records.

Orbitz shall not use or access the Worldspan System, including data and services provided through such system, without Worldspan's prior written consent (i) to make bookings on any CRS other than Worldspan, (ii) to make bookings on any airline or other reservation system (except as permitted in Section 2.10), (iii) to develop or test software applications, including without limitation, booking engines, corporate booking programs, FLIFO-type products, fares and pricing tools, caching products, travel agent desktop tools, and airline hosting applications (which such prior written consent shall not be unreasonably withheld), or (iv) in any other manner that is not expressly permitted hereunder or is unauthorized or improper.

Orbitz' employees, agents, and Users may not enter passive bookings (e.g., GC, HK, MK or BK codes) into the Worldspan System when no corresponding space has been reserved with the corresponding travel supplier's internal reservations system. Any passive bookings will be removed from the Worldspan System if the corresponding space is cancelled.

(v)     The material and information supplied by Worldspan will not be manipulated in a manner that would lead to inaccurate, misleading, or discriminatory presentation of information to consumers.

Orbitz will promptly report to Worldspan any incidents of suspected unauthorized access to or use of the Worldspan System and will use reasonable commercial efforts to curtail access to or use of the Worldspan System by any User upon Worldspan's reasonable request.

Other than as described in Section 2.10, Section 4.7(c), or as may be mutually agreed in writing by the parties, Orbitz shall not, effective January 1, 2003, use the Worldspan System to service Supplier Link Segments, including but not limited to, such services as PNR storage, queues, profiles, fares and pricing systems, Auto Re-Issues or Rapid Re-Price. Also, Orbitz shall not use the Worldspan System to search for fares,

5

<Page>

rates, schedules or itineraries that involve Airline Direct Connect Segments."

5.     Section 4.4 of the Agreement is hereby restated in its entirety to provide as follows:

"4.4 [Intentionally Deleted]"

6.     A new Section 4.7 is hereby added to the Agreement to provide as follows:

"4.7 SUPPLIER LINK CONDITIONS AND PROCESSING FEE.

(a)     Effective January 1, 2003, within 90 days after the Implementation Date for an Airline Direct Connect Customer, Orbitz shall discontinue all access, either directly or through ITA, to the Worldspan System with respect to Supplier Link Segments for such Airline Direct Connect Customer. In the event Orbitz or ITA, acting at the direction and on behalf of Orbitz, as the case may be, continues to generate DIR INVQ Messages for any Airline Direct Connect Customer more than 90 days after the Implementation

Date, Orbitz shall pay Worldspan a monthly processing fee in accordance with Table 1 set forth on Schedule E for each such month.

(b)     Orbitz will use its good faith efforts to keep Worldspan's Contract Manager apprised of the expected Implementation Date for each Airline Direct Connect Customer and each Direct Connect Car Customer no less than 30 days prior to the anticipated Implementation Date, and to coordinate with the Worldspan Contract Manager during such 30 day period. Following the actual Implementation Date for each Airline Direct Connect Customer and each Direct Connect Car Customer, Orbitz will provide prompt and simultaneous notice thereof to Worldspan's Contract Manager and the carrier or car rental company, as applicable. No later than 90 days after the Implementation Date of an Airline Direct Connect Customer, Orbitz will reduce the total DIR INVQ Messages sent to Worldspan on Orbitz' behalf by the amount shown on Table 2 set forth on Schedule E for each named carrier. Upon implementation of all of the Core Airline Customers as Airline Direct Connect Customers, Orbitz shall be permitted no more than a total of 5 DIR INVQ Messages per second to supply the availability cache for all carriers other than the Airline Direct Connect Customers.

(c)     Notwithstanding Sections 4.7(a) and (b), Orbitz shall discontinue all access, either directly or through ITA, to the Worldspan System with respect to Supplier Link Segments for American Airlines no later than January 31, 2003 and with respect to Supplier Link Segments for Continental Airlines no later than January 1, 2003. In the event Orbitz or ITA, acting at the direction and on behalf of Orbitz, as the case may be continues to generate DIR INVQ Messages for American Airlines or Continental Airlines after January 1, 2003, Orbitz shall pay Worldspan a monthly processing fee in accordance with Table 1 set forth on Schedule E for each month of usage.

6

<Page>

A new Section 4.8 is hereby added to the Agreement to provide as follows:

"4.8 MINIMUM SEGMENT FEES. Commencing January 1, 2003 and through the balance of the Term of this Agreement, in the event Orbitz does not satisfy the minimum Net Segments or minimum Net Car Segments requirements described in subsection (a) or (b) below, Orbitz will pay Worldspan a fee ("Minimum Segment Fee") calculated as follows:

(a)     In the event Orbitz does not satisfy the requirements of Section 3.2(b) with respect to a particular calendar quarter, then, in addition to all payments under this Agreement, Orbitz shall pay to Worldspan a Minimum Segment Fee equal to the difference between the Applicable Quarterly Minimum for such calendar quarter and the Adjusted Quarterly Net Segments applicable to such calendar quarter, multiplied by $1.78.

(b)     In the event Orbitz books a Direct Connect Car Segment in a particular calendar quarter through a Direct Connect Car Customer and does not, during such calendar quarter, book at least the minimum Net Car Segments set forth below through the Worldspan System ("Applicable Quarterly Minimum Net Car Segments"), then, in addition to all payments under this Agreement, Orbitz shall pay to Worldspan a Minimum Segment Fee equal to the difference between the Applicable Quarterly Minimum Net Car Segments set forth below and the Adjusted Quarterly Net Car Segments (as defined below) for such calendar quarter, multiplied by $1.78.

For purposes of the foregoing calculation, the number of Net Car Segments (if any) by which the Applicable Quarterly Minimum Net Car Segments for a

particular calendar quarter is exceeded shall be carried forward and applied to the next subsequent quarter in such calendar year. The number of Net Car Segments in a particular calendar quarter plus the number of excess Net Car Segments carried forward, if any, from the previous calendar quarter(s) in such calendar year shall be referred to as the "Adjusted Quarterly Net Car Segments." With respect to the calendar quarter ending March 31, the Adjusted Quarterly Net Car Segments shall equal the number of actual Net Car Segments booked through the Worldspan System during such calendar year.

For illustration, if the number of Net Car Segments achieved in the calendar quarter ending March 31, 2003 is [***], thus exceeding the Applicable Quarterly Minimum Net Car Segments for such quarter by 100,000, then the Adjusted Quarterly Net Car Segments for the quarter ending June 30, 2003 shall be the number of Net Car Segments actually achieved in such quarter, plus 100,000, and to the extent this Adjusted Quarterly Net Car Segments value exceeds the Applicable Quarterly Minimum Net Car Segments of [***] for the quarter ending

----------

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

<Page>

June 30, 2003, such excess shall be applied toward the Adjusted Quarterly Net Car Segment calculation for the quarter ending September 30, 2003. No such excess shall be carried forward into a subsequent calendar year or backward into a previous calendar year.

Notwithstanding the foregoing, no Minimum Segment Fee shall be payable by Orbitz, even if the total number of Adjusted Quarterly Net Car Segments for a given calendar quarter does not equal or exceed the value set forth below, if, (i) a Safe Harbor Event has occurred, (ii) Orbitz has provided notice to Worldspan of such Safe Harbor Event within 20 days following its occurrence, (iii) Orbitz has not provided notice to Worldspan of a prior Safe Harbor Event during such calendar year, and (iv) beginning on the fifth business day following Orbitz' provision of such notice to Worldspan, for the remainder of the calendar quarter and until the end of the calendar year (or such earlier time as Orbitz declares, by written notice to Worldspan, the conclusion of the Safe Harbor Event), Orbitz has eliminated all Direct Connect Car Segments and processes 100% of Orbitz' car bookings through Worldspan.

<Table>
<Caption>

| CALENDAR QUARTERS IN YEAR | APPLICABLE QUARTERLY MINIMUM NET CAR SEGMENTS |
|---|---|
| <S> | <C> |
| 2003 | [***] |
| 2004 | [***] |
| 2005 | [***] |
| 2006 | [***] |
| 2007 | [***] |
| 2008 | [***] |
| 2009 | [***] |

| | |
|---|---|
| 2010 | [***] |
| 2011 | [***] |

</Table>

(c) In the event Orbitz fails to meet both subparagraphs (a) and (b), Orbitz will pay the greater of the Minimum Segment Fee set forth in subparagraph (a) or (b).

(d) Orbitz shall pay the Minimum Segment Fee to Worldspan within 30 days after the end of the calendar quarter for which the minimum was not achieved.

(e) In the event Orbitz has paid a Minimum Segment Fee pursuant to subparagraph (a) with respect to the first, second and/or third calendar quarter of a particular calendar year, then such Minimum Segment Fee(s) shall be reimbursed by Worldspan to Orbitz within 30 days following the conclusion of such calendar year if the number of Net Segments achieved during such calendar year exceeds the sum

----------

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

<Page>

of the Applicable Quarterly Minimums for the four calendar quarters comprising such calendar year. In no event shall such reimbursement exceed the Minimum Segment Fees actually paid by Orbitz pursuant to subparagraph (a) with respect to such calendar year.

(f) In the event Orbitz has paid a Minimum Segment Fee pursuant to subparagraph (b) with respect to the first, second and/or third calendar quarter of a particular calendar year, then such Minimum Segment Fee(s) shall be reimbursed by Worldspan to Orbitz within 30 days following the conclusion of such calendar year, if the number of Net Car Segments achieved during such calendar year exceeds the sum of the Applicable Quarterly Minimum Net Car Segments for the four calendar quarters comprising such calendar year. In no event shall such reimbursement exceed the Minimum Segment Fees actually paid by Orbitz pursuant to subparagraph (b) with respect to such calendar year.

(g) If this Agreement terminates in the middle of a calendar quarter, then (A) the Minimum Segment Fee, if applicable, for the final quarter of this Agreement shall be prorated on a per diem basis based on the Applicable Quarterly Minimum requirement for Net Segments and the Applicable Quarterly Minimum Net Car Segment requirement for Net Car Segments for the quarter in which this Agreement terminates and (B) if the number of Net Segments or Net Car Segments, as the case may be, achieved during such calendar year exceeds the sum of the Applicable Quarterly Minimums or Applicable Quarterly Minimum Net Car Segments, respectively, for any prior calendar quarters in such calendar year PLUS the pro rated requirement calculated pursuant to (A) above, then any Minimum Net Segment Fees paid by Orbitz with respect to such calendar year shall be reimbursed by Worldspan to Orbitz within 30 days following the termination of the Agreement.

(h) Notwithstanding the foregoing, no Minimum Segment Fee shall apply in any calendar year in which Orbitz terminates the Agreement in accordance

with Section 7.1, 7.2, 7.3, 7.4, 7.5 or 9.1."

8.    Section 9.1 is amended by adding the following to the end thereof:

"Notwithstanding the foregoing, in the event (x) Orbitz merges, consolidates, or otherwise combines with a CRS; or (y) substantially all of the operating assets of Orbitz are acquired by a CRS; Orbitz shall not assign or transfer this Agreement or any of its rights or obligations under this Agreement, without the prior written consent of Worldspan. In the event Orbitz requests a consent in connection with a proposed transaction described in (x) or (y) above, and Worldspan fails to provide such consent within 10 days of receipt of the request, then such consent shall be deemed to have been denied, and either Orbitz or Worldspan shall have the right to terminate this Agreement, by notice to the other, with such termination not to take effect until the consummation of such proposed transaction.

9.    Section 9.15 is hereby restated in its entirety to provide as follows:

9

<Page>

"9.15 ORBITZ AUDIT RIGHTS. During the Term of this Agreement and for one (1) year thereafter, Worldspan agrees to keep all usual and proper records and books of account relating to the products and services provided by Worldspan and operation of the Worldspan System pursuant this Agreement. Once each calendar year during the Term of the Agreement, and upon twenty (20) days prior written notice to Worldspan, Orbitz may have an auditor inspect the records and other information collected, generated or maintained by Worldspan arising out of or in connection with the provision of the services pursuant to this Agreement, during Worldspan 's normal business hours, for the sole purpose of determining the accuracy of the charges, expenses, costs, fees, service levels, and otherwise determining Worldspan's compliance with this Agreement. Orbitz shall pay for all the costs of such inspection, including all reports and any other information supplied. Information disclosed to Orbitz or to its auditing representative in the course of such inspection shall be subject to the confidentiality requirements of this Agreement and may not be used for any purpose whatsoever other than the determination of compliance with Worldspan's obligations under this Agreement."

10.   A new Section 9.16 is hereby added to the Agreement to provide as follows:

"9.16 WORLDSPAN'S AUDIT RIGHTS. During the Term of this Agreement and for one (1) year thereafter, Orbitz agrees to keep all usual and proper records and books of account relating to Net Segments and Supplier Link Segments generated by Orbitz, the operation of the Orbitz Website, and other activities and matters pursuant this Agreement. Once each calendar year during the Term of the Agreement, and upon twenty (20) business days prior written notice to Orbitz, Worldspan may have an auditor inspect the records and other information collected, generated or maintained by Orbitz arising out of or in connection with this Agreement, during Orbitz' normal business hours, for the sole purpose of determining the accuracy of the calculation of Net Segments and Supplier Link Segments, and otherwise determining Orbitz' compliance with this Agreement. Worldspan shall pay for all of the costs of such inspection, including all reports and any other information supplied. Information disclosed to Worldspan or to its auditing representative in the course of such inspection shall be subject to the confidentiality requirements of this Agreement and may not be used for any purpose whatsoever other than the determination of compliance with Orbitz's obligations under this Agreement."

11.  A new Section 9.17 is hereby added to the Agreement to provide as follows:

"9.17 NO CONFLICT. (a) Worldspan represents and warrants to Orbitz that neither the execution and delivery of this Agreement nor the performance by Worldspan of its obligations hereunder does or will constitute a breach, default, or violation of any of Worldspan's obligations under any contract, agreement, license, consent or permit to which it is a party.

10

<Page>

(b)     Except as provided in the next sentence, Orbitz represents and warrants to Worldspan that neither the execution and delivery of this Agreement nor the performance by Orbitz of its obligations hereunder does or will constitute a breach, default, or violation of any of Orbitz's obligations under any contract, agreement, license, consent or permit to which it is a party. In light of the complaint filed by Amadeus Global Travel Distribution, S.A. and Amadeus s.a.s. (collectively, "Amadeus") against Orbitz in the United States District Court for the District of Delaware, Orbitz represents and warrants, to the best of its knowledge and belief, that neither the execution and delivery of this Agreement nor the performance by Orbitz of its obligations hereunder does or will constitute a breach, default, or violation of any of Orbitz's obligations to Amadeus under its agreements with ITA Software, Inc."

12.  The definition of "Airline Direct Connect Segment" in Schedule A of the Agreement is hereby amended to provide as follows:

"Airline Direct Connect Segment" means each nonstop or direct airline flight booked by means of the Orbitz Website with an Airline Direct Connect Customer using that carrier's internal airline reservation system and not using a CRS or global distribution system."

The definition of "CRS" in Schedule A of the Agreement is hereby amended to provide as follows:

"CRS" means a computer reservation system that is operated by Worldspan, Sabre, Galileo, Amadeus, Abacus, Infini, Axxess, Pegasus, Wizcom or by any other company that operates such a system in order to provide information about the schedules, fares, rates, and availability of the products and services of travel suppliers and to enable the making of reservations and the issuance of tickets for such products and services, but excluding a travel supplier's own system (including where a travel supplier's own system is, or is a partition within, a computer system that would otherwise be a CRS hereunder) to the extent such travel supplier's own systems are used to provide information and enable the making of reservations and the issuance of tickets for that particular travel supplier. As examples, the internal system of Lufthansa for the issuance of airline tickets and the internal system of Avis for the making of car reservations would not be considered CRSs even if such systems were maintained by Amadeus and Wizcom, respectively, within the computer reservation systems operated by Amadeus and Wizcom.

13.  Schedule A of the Agreement is hereby amended by adding the following definitions:

"Adjusted Quarterly Direct Connect Car Segments" has the meaning set forth in Section 4.8(b).

"Adjusted Quarterly Net Segments" has the meaning set forth in Section 3.2(b).

11

<Page>

"Airline Direct Connect Customer" means any airline that has a relationship with Orbitz whereby Orbitz makes air bookings using that air carrier's internal airline reservation system rather than using a CRS or global distribution system.

"Airline Non-Direct Connect Segment" means each direct or through flight booked by means of the Orbitz Website that is not an Airline Direct Connect Segment.

"Allowable Messages" has the meaning set forth in Schedule E.

"Applicable Quarterly Minimum" has the meaning set forth in Section3.2(b).

"Applicable Quarterly Minimum Net Car Segments" has the meaning set forth in Section 4.8(b).

"Availability Data Services" means the service and related information provided by Worldspan through the Worldspan System whereby Worldspan receives, processes and/or responds to the following data or requests by or on behalf of Orbitz for availability information on airlines or otherwise makes such availability information accessible to Orbitz: DIR INVQ, AVS Data, and AVL Data.

"AVL Data" means data related to any request for availability information which is received from a user of the Worldspan System other than Orbitz. AVL Data will include all the data in such response other than data that Worldspan reasonably deems to be sensitive (such as the identity of the originator of the request).

"AVS Data" means data comprising flight availability status information relating to specific flights, dates, routings and classes of service.

"Core Airline Direct Connect Customers" mean Delta Air Lines, American Airlines, Northwest Airlines, Continental Airlines, US Airways and United Airlines or their successors and assigns.

"Direct Connect Car Customer" means any car rental company that has a relationship with Orbitz whereby Orbitz makes car rental bookings using that company's internal car rental reservation system and not using a CRS or global distribution system.

"Direct Connect Car Segment" means each car rental booked by means of the Orbitz Website with a car rental company using that company's internal car rental reservation system and not using a CRS, or global distribution system.

"Direct Connect Hotel Segment" means each hotel booked by means of the Orbitz Website with a hotel company using that company's internal hotel reservation system and not using a CRS, or global distribution system.

12

<Page>

"DIR INVQ Message" means a request and/or the associated response for

availability on one or more flights of an air carrier that participates in the Worldspan System at the Airline Source level.

"ITA" means ITA Software, Inc.

"Implementation Date" means the first date on which booking capabilities for Direct Connect Segments on behalf of an Airline Direct Connect Customer are first made commercially available to the general public.

"Minimum Segment Fee" has the meaning set forth in Section 4.8.

"Orbitz Website" shall have the meaning set forth in the recitals to this Agreement.

"Safe Harbor Event" means either (i) an act of God, natural disaster, civil disturbance, strike, labor unrest, act of war (whether declared or undeclared), act of terrorism, outbreak or escalation of hostilities, or other calamity or crisis which has a material adverse effect on Orbitz' business and the travel industry generally, or (ii) the first period of two consecutive calendar months in a calendar year in which the total number of air and car booking transactions completed by Orbitz, as measured by Orbitz, has declined, in each such month, by more than 10% when compared to the same calendar months in calendar year 2002.

"Supplier Link Segments" mean the total of Airline Direct Connect Segments, Direct Connect Car Segments and Direct Connect Hotel Segments.

"Worldspan Customer" means (i) any location that, in the previous calendar year, processed 100,000 annual segments, or more than 50% of its bookings, on the Worldspan System or that, in the then-current calendar year, has a contract or agreement with Worldspan and expects to achieve such booking levels, or (ii) any Trip Manager location that has a contract or agreement with Worldspan to use the Worldspan System.

14. Following effectiveness of this Amendment, Worldspan and Orbitz agree to issue a joint press release substantially in the form attached hereto as Exhibit A.

15. This Amendment shall be construed in connection with and as part of the Agreement, and except as expressly modified above, all of the provisions of the Agreement are hereby ratified and shall be and remain in full force and effect.

16. This Amendment may be executed in multiple counterparts, each of which will be an original and all of which will constitute one and the same instrument.

17. Any and all notices, requests, orders and other instruments executed and delivered after the execution of this Amendment may refer to the Agreement without making specific reference to this Amendment but nevertheless all such references shall be

13

<Page>

deemed to include this Amendment unless the context otherwise requires.

IN WITNESS WHEREOF, each of Orbitz and Worldspan has caused this Amendment to be executed by its duly authorized representative as of the date first above written.

ORBITZ, LLC                                      WORLDSPAN, L.P.

By:    /s/: Gary Doernhoefer           By:    /s/: Howard Kresst
       -------------------------              ----------------------

Title:  VP & General Counsel          Title: VP
       ---------------------------           -----------------------

14

<Page>

SCHEDULE E

FEES AND DIR INVQ MESSAGE REDUCTIONS

In the event Orbitz or ITA acting at the direction of and on behalf of Orbitz
continues to generate DIR INVQ Messages for an Airline Direct Connect Customer
more than 90 days after the Implementation Date, Orbitz shall pay Worldspan the
following monthly processing fee (without proration for any partial month):

Table 1

<Table>
<Caption>

| AIRLINE DIRECT CONNECT CUSTOMER | MONTHLY PROCESSING FEE |
|---|---|
| <S> | <C> |
| American Airlines | $ [***] |
| Continental Airlines | $ [***] |
| Delta Air Lines | $ [***] |
| Northwest Airlines | $ [***] |
| United Airlines | $ [***] |
| US Airways | $ [***] |
| America West | $ [***] |
| Alaska Airlines | $ [***] |
| American Trans Air | $ [***] |
| Air Tran Airways | $ [***] |
| National Airlines | $ [***] |
| Air Canada | $ [***] |
| Frontier Airlines | $ [***] |
| Spirit Airlines | $ [***] |
| Vanguard Airlines | $ [***] |
| Mexicana Airlines | $ [***] |
| British Airways | $ [***] |
| Hawaiian Airlines | $ [***] |
| Midwest Express Airlines | $ [***] |
| Aloha Airlines | $ [***] |
| Air France | $ [***] |
| All other carriers | $ [***] |

</Table>

Notwithstanding the foregoing, in the event an air carrier merges with another
air carrier, then the monthly processing fee set forth in Table 1 shall be
calculated by adding the applicable monthly processing fees for the merged
carriers. In the event that Worldspan adds new participating carriers, then the

monthly processing fee set forth in Table 1 shall be calculated by Worldspan based on Worldspan's then current charges, but shall not be greater than the charges applicable to similarly situated carriers of equivalent volume.

----------
*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.

<Page>

Orbitz, or ITA acting at the direction of and on behalf of Orbitz, as the case may be, may forward 22 DIR INVQ Messages per second ("Allowable Messages"), subject to reduction in accordance with the following:

   (i)   Orbitz agrees that it will cause ITA to make such changes and modifications as necessary in order to reduce the number of DIR INVQ Messages per second by 4 prior to January 1, 2003, subject to Worldspan providing such cooperation and assistance reasonably necessary for ITA and Orbitz to achieve the foregoing.

   (ii)  In addition, as each of the following air carriers (i) becomes an Airline Direct Connect Customer, (ii) ceases participation in the Worldspan System at the Airline Source level, or (iii) ceases operations, the number of Allowable Messages shall be reduced as set forth in the following table:

Table 2

<Table>
<Caption>

| AIRLINE DIRECT CONNECT CUSTOMER | NUMBER OF DIR INVQ MESSAGES PER SECOND TO BE REDUCED* |
|---|---|
| <S> | <C> |
| American Airlines | [***] |
| Continental Airlines | [***] |
| Delta Air Lines | [***] |
| Northwest Airlines | [***] |
| United Airlines | [***] |
| US Airways | [***] |

</Table>

         *EXCEPT THAT, WITH RESPECT TO ANY PERIOD FOR WHICH ORBITZ HAS PAID TO WORLDSPAN THE RELEVANT PROCESSING FEE FOR A NAMED CARRIER AS SET FORTH IN TABLE 1 ABOVE, NO REDUCTION IN DIR INVQ MESSAGES FOR SUCH CARRIER SHALL BE REQUIRED.

Notwithstanding the foregoing, in the event any Core Airline Direct Connect Customer merges with another Core Airline Direct Connect Customer, then the number of DIR INVQ Messages set forth in Table 2 shall be subject to adjustment by Worldspan but in no event will the adjustment be more than the sum of the number of DIR INVQ Messages per second in Table 2 for each carrier involved in the merger.

----------
*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the

omitted portions.

2

<Page>

EXHIBIT A
FORM OF JOINT PRESS RELEASE


WORLDSPAN AND ORBITZ CONFIRM TECHNOLOGY PARTNERSHIP

ATLANTA, CHICAGO, XXXXXXX, 2002--Worldspan and Orbitz today announced a new long-term technology partnership agreement to support Orbitz' domestic airline bookings. Both parties confirmed that Worldspan remains Orbitz' preferred technology partner and they have finalized their long-term contract that includes an agreement for Orbitz to purchase a broad range of technology services. This relationship is an important joint step in reengineering the distribution industry's business model.

Worldspan, which has been instrumental in changing the industry's dynamics, will continue to supply Orbitz with the technology needed to maintain Availability Processing, Flight Information (FLIFO) via XML and booking for international, interline, and paper tickets and for all other airlines who do not choose to subscribe to the Supplier Link booking service.

"Worldspan remains committed to the efficiency of the industry," said Paul Blackney, Worldspan's president and chief executive officer. "Our partnership with Orbitz is a strong commitment by both companies to do what it takes to provide valuable innovations to the traveling public. We pride ourselves on our inventive technology, innovative solutions and customer support and look forward to continuing to be Orbitz' technology partner."

"Worldspan's reliability and innovation has been a contributing factor to Orbitz's success," said Jeff Katz, Orbitz President and CEO. "We look forward to continuing our successful technology partnership as Orbitz grows its business as a leader in online travel."

<Page>

-more-

WORLDSPAN(R) AND ORBITZ ANNOUNCE JOINT AGREEMENT ON SUPPLIER LINK TECHNOLOGY--PAGE 2


ABOUT WORLDSPAN
Worldspan provides global electronic distribution of travel information, Internet products and connectivity, and electronic commerce capabilities for travel agencies, travel service providers and corporations worldwide. The company's three lines of business are travel supplier services, e-commerce, and global distribution systems for the worldwide travel industry. The Worldspan reservations system provides nearly 20,000 travel agencies and other users worldwide with travel data and booking capabilities for hundreds of the world's leading travel supplier services. Worldspan is the market leader in e-commerce for the travel industry, processing more than 50 percent of all online travel agency bookings. The company maintains world headquarters in Atlanta, Georgia. Additional information is available at www.worldspan.com.


ABOUT ORBITZ

Orbitz is a leading online travel company offering consumers the largest selection of low airfares, as well as deals on lodging, car rentals, cruises, vacation packages and other travel. Orbitz' state-of the-art flight search engine searches more than 455 airlines - up to 2 billion flight and fare options - offering an unbiased and comprehensive list of airfares and schedules. Orbitz also offers consumers a large collection of discounted web-only air fares. For more information, visit www.orbitz.com.

### ###

CONTACT: Bobbi Passavanti, Worldspan, 770-563-2558,
email: bobbi.passavanti@worldspan.com

Carol Jouzaitis, Orbitz, 312-894-4774, email: carol@orbitz.com

2

</TEXT>
</DOCUMENT>

EX-10.5(A) 3 a2135668zex-10_5a.htm EX-10.5(A)

Exhibit 10.5(a)

### SECOND AMENDMENT
### TO THE
### AMENDED AND RESTATED AGREEMENT
### FOR CRS ACCESS AND RELATED SERVICES

This SECOND AMENDMENT TO THE AMENDED AND RESTATED AGREEMENT FOR CRS ACCESS AND RELATED SERVICES (this "Amendment"), dated as of January 28, 2004 ("Amendment Effective Date"), is between Worldspan, L.P., a Delaware limited partnership, ("Worldspan") and Orbitz, LLC, a Delaware limited liability company ("Orbitz").

WHEREAS, Orbitz and Worldspan entered into that certain Amended and Restated Agreement for CRS Access and Related Services dated as of November 1, 2001 and as amended effective as of December 13, 2002 and December 23, 2002 ("Agreement"); and

WHEREAS, Orbitz and Worldspan desire to amend the Agreement as set forth herein;

NOW, THEREFORE, Orbitz and Worldspan hereby agree to amend the Agreement as follows:

1.    Section 5.3 of the Agreement is hereby amended by adding the following sentence to the end of said section:

      "Worldspan will provide weekly booking segment data to Orbitz effective with the week commencing on February 15, 2004, subject to the Parties' mutual agreement on the content of the data and subject to the data being reconciled at the end of each calendar month."

2.    The definition of Material Service Level Failure in Paragraph 26(a) of Schedule A of the Agreement is amended to provide as follows:

      "(a) The Monthly System Availability of the Worldspan System is below [***]% for any [***] calendar months in any period of [***] consecutive calendar months during the Term of this Agreement."

3.    This Amendment shall be construed in connection with and as part of the Agreement, and except as expressly modified above, all of the provisions of the Agreement are hereby ratified and shall be and remain in full force and effect.

4.    This Amendment may be executed in multiple counterparts, each of which will be an original and all of which will constitute one and the same instrument.

5.    Any and all notices, requests, orders and other instruments executed and delivered after the execution of this Amendment may refer to the Agreement without making specific reference to this Amendment but nevertheless all such references shall be deemed to include this Amendment unless the context otherwise requires.

IN WITNESS WHEREOF, each of Orbitz and Worldspan has caused this Amendment to be executed by its duly authorized representative as of the date first above written.

**Orbitz, LLC**                                    **Worldspan, L.P.**

By:    /s/ GARY DOERNHOEFER             By:    /s/ R. GANGWAL

Title:    V.P. & GENERAL COUNSEL         Title:    CHAIRMAN, PRESIDENT &

CHIEF EXECUTIVE OFFICER

*** Certain information on this page has been omitted and filed separately with the Commission. Confidential treatment has been requested with respect to the omitted portions.